## ECKLUND v. UNITED STATES.
### No. 10222.

Circuit Court of Appeals, Sixth Circuit.

Jan. 20, 1947.

Ralph Helper, of Detroit, Mich. (George C. Parzen and Harold Helper, both of Detroit, Mich., on the brief), for appellant.

Joseph C. Murphy, of Detroit, Mich. (John C. Lehr and Joseph C. Murphy, both of Detroit, Mich., on the brief), for appellee.

Before SIMONS, MARTIN, and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

The jury returned a verdict of guilty against the appellant, Reginald A. Ecklund, on an information charging him and E. B. Eldridge with unlawfully, wilfully and knowingly selling a 1942 Chevrolet sedan above the lawful maximum ceiling price provided by O. P. A. Regulations promulgated in pursuance of Acts of Congress.[1] Appellant was fined $500 and sentenced to eight months' imprisonment.

At the time of Ecklund's trial, the co-defendant, E. B. Eldridge, was a fugitive from justice. Though the information charged that Ecklund and Eldridge were doing business as Eck Motor Sales, appellant testified, without contradiction, that, on September 12, 1945, when the transaction in controversy occurred, he and his wife constituted a partnership under that firm name and that Eldridge was merely employed by them as a salesman on a commission basis.

It is apparent from the record that the conviction of Ecklund rested almost exclusively on the testimony of Mrs. Blanche Nitek. The testimony of her husband, Walter Nitek, was barely corroborative upon the essential issue of whether Ecklund

---

[6] Bender v. Donoghue et al., 5 Cir., 70 F.2d 723.

[1] The information specifically charged wilful violation of Sec. 2, Maximum Price Regulation 540, as amended, issued June 10, 1944, effective July 10, 1944, 9 F.R. 6434, by the Price Administrator of the Office of Price Administration, pursuant to the authority of Sec. 2(a) of the Emergency Price Control Act of 1942, as amended (56 Stat. 23, 57 Stat. 566, Pub.Law 383, 78th Congress, Public Law 108, 79th Congress, 50 U.S.C.A.Appendix, § 902(a); 56 Stat. 765, 50 U.S.C.A.Appendix, § 961 et seq.; Executive Order 9250, 50 U.S.C.A.Appendix, § 901 note, 7 F.R. 7871, Executive Order 9328, 50 U.S.C.A.Appendix, § 901 note, 8 F.R. 4681); as amended by Appendix B amended by Am. 1, 9 F.R. 7871, Am. 2, 9 F.R. 10872, Am. 3, 9 F.R. 12679, Am. 5, 10 F.R. 1383, Am. 6, 10 F.R. 1911, and Am. 10, 10 F.R. 1383.

had guilty knowledge that his salesman, Eldridge, was selling the automobile above the lawful ceiling price.

It appears that, around six or half-past six o'clock in the evening of September 12, 1945, Mrs. Nitek and her husband went to the used-car lot of the Eck Motor Sales to buy a used car. They talked with the salesman, Eldridge, who showed them around the lot. He took them for a ride in both a Dodge and a Chevrolet. Without discussion of ceiling prices, they were informed by him that the price of the Chevrolet would be $1495, and they agreed to purchase it.

Not having the necessary cash in hand, they were driven to their home by Eldridge in order to pick up their bank book. They returned to the lot and entered the office of Eck Motor Sales. Eldridge "proceeded to draw up the papers for the transaction," according to Mrs. Nitek. She testified that Ecklund was sitting at his desk nearby; that Eldridge prepared the papers, showing a price of $1495, plus tax, making a total of $1532; and that Eldridge asked if they wished to save eleven dollars. On receiving an affirmative answer, he tore up the papers and threw them into a wastepaper basket.

She testified that, under instruction of appellant, the salesman, Eldridge, told them to draw two checks, one to Eck Motor Sales for $1232.85 and another to Eldridge for $300; and that, also under instruction of appellant, Eldridge "made up another paper then using the selling price of the car at twelve hundred and some odd dollars." Payment was effectuated by two withdrawals on their bank book as evidenced by Cashier's checks: one for $1232.85, payable to Eck Motor Sales and so endorsed for deposit; the other for $300, payable to E. B. Eldridge and endorsed by him alone.

On cross-examination, the witness admitted that Eldridge "was the only one we talked to about the amount that we were going to pay," and that they had no direct conversation with appellant Ecklund. She remained steadfast in her testimony that Ecklund told Eldridge to draw one check for $1232.85 [the legitimate ceiling price] payable to Eck Motor Sales, and the other

for $300 payable to Eldridge. She stated that Eldridge made out the certificate of transfer of used passenger cars on the O. P. A. printed form, giving the actual sales price for the vehicle, including taxes, as $1232.85. She did not recall that Ecklund even saw that document.

Nitek testified that Eldridge and Ecklund were present in the sales office on the lot when the deal was closed; that Eldridge drew up some papers which Nitek and his wife signed; that Ecklund and Eldridge discussed making out two different orders—one for $300 and one for "about 1200 or so"—but that he could not recall whether Eldridge told Ecklund what he proposed to do or whether Ecklund suggested to Eldridge the method used. "Both were talking," and the witness did not pay much attention to them. He admitted that he gave no money to Ecklund; that Ecklund never said anything whatever to him about the price of the automobile; and that he "never saw him except on the evening of September 12, 1945, until sometime later." Asked whether he meant by his testimony that Eldridge told Ecklund at what price the car was being sold, he answered: "Why, yes, I guess he must have." Pressed by leading questions to state that Ecklund directed the drawing of separate checks, as above described, he answered confusedly: "Well, no, I mean—well, I mean that they were directing the deal there, but—but—well, of course, at that time I did not pay much attention." On re-cross-examination, moreover, he again stated that he did not pay much attention to the conversation between Eldridge and Ecklund; that he meant that they were just talking about the deal. On the whole, his testimony was vague and uncertain.

Testifying in his own behalf, Ecklund stated that, on the evening of September 12, 1945, he was in his office only about ten minutes, for the reason that he had to pick up a reservation on a plane to Buffalo that night on a last-minute call requiring him to rush out to the airport. During the ten minutes in his office, he had very little conversation with the Niteks and did not talk to them about an automobile, being in a hurry to get to the airport; that "noth-

ing was said with reference to more than one check being made out for the purchase of this automobile"; that he did not know how much money the Niteks were to pay for the car; that he instructed his salesmen to sell at the ceiling price; that he was not interested in the particular sale, because Eldridge was "capable of handling his own deals"; and that the Niteks were supposed to pay $1232.85, including tax and title transfers. His conversation with Eldridge, so he said, was to suggest that, inasmuch as the Niteks did not have the cash with which to buy the automobile, they should arrange with Eldridge to get their money from the bank and pay for the automobile next day. He emphatically denied that he had authorized Eldridge to have a check for any part of the purchase price made payable to himself. He declared that his firm received $1232.85 for the Chevrolet automobile; that he never at any time received any additional money for it, or authorized anyone to sell the machine for more than $1232.85, the lawful ceiling price; that he did not know that Eldridge got a check for $300; that neither Eldridge nor anyone else ever told him about it until the Niteks later informed him, when he accompanied them to their attorney's office, that they had paid Eldridge $300 over the ceiling price.

The appellant was corroborated by his Sales' Manager, James A. Gudgel, who, incidentally, signed the afore-mentioned certificate of transfer as authorized agent of the Eck Motor Sales. He testified that when Eldridge asked Ecklund if it would be all right to deliver the car to the Niteks that night, Ecklund asked: "What are you selling the car for?" Eldridge then handed Ecklund a bill of sale form, which the latter examined and said, "Sure." Ecklund then suggested that Eldridge meet the Niteks at noon of the following day, pick up Mr. Nitek, take him to the bank to get the money and then take him back to work. Mr. Nitek protested that the suggested arrangement was unsatisfactory, for the reason that he had to be at work and would not have time to eat his lunch and get back on the job. "So, if I remember correctly," the witness stated, "Mr. Eldridge took them home that night and they gave him the pass book." Next day, Eldridge brought him a check to Eck Motor Sales for $1232.85, which he deposited on September 14, 1945, Ecklund being out of the city. Eldridge did not tell Gudgel that he had received more than the ceiling price for the automobile. The witness sent a copy of the certificate of transfer and warranty to the local office of O. P. A. He and Ecklund were the only persons who had authority to make the warranty for the Eck Motor Sales on the O. P. A. form.

The foregoing narrative embraces the substance of all the relevant testimony pertaining to the sale of the automobile in question.

When the Niteks discovered, by investigation through the O. P. A., that they had paid an over-ceiling price for the Chevrolet car, they took up the matter with Eldridge, but not with the appellant, Ecklund. Several days later, they consulted an attorney, who advised them to see Ecklund before instituting suit, as he "might want to settle out of court."

Asked by the Government attorney whether they subsequently instituted suit, Mrs. Nitek replied that, when they saw Ecklund, he said that he did not have time to talk to them and did not remember the deal. He told them to come to see him the next night, which they did. After unsuccessfully awaiting his appearance for some fifteen to twenty-five minutes, the Niteks became tired and left. Several days later, they went again to their lawyer.

The assistant district attorney asked: "Did you subsequently make a settlement with Mr. Ecklund?" The attorney for the defendant objected to the question. Addressing the Government attorney, the trial judge asked: "What do you claim?"

"We claim that a settlement was made and was evidence," answered the Government's legal representative. "We submit that the action on the part of the defendant subsequent to that sale *was evidence of his knowledge and guilt in this matter.*" [Italics supplied.]

The court then asked defense counsel: "What is the objection?" The attorney answered: "The objection is that it has no bearing whatsoever on the issues in-

volved in this case and that any testimony in that respect may tremendously prejudice his rights in this court. It has no bearing whatsoever."

The court ruled the question competent and permitted Mrs. Nitek to answer that she and her husband had made a settlement with Ecklund. It is insisted on appeal that the ruling of the district court was prejudicially erroneous and impels reversal and remand of the case for retrial. The question presents novelty.

No direct authority upon the exact issue has been adduced by either the attorneys for appellant or the attorneys for the United States. The reasoning on both sides is by analogy; but, of course, to different conclusions. The Government contends that the rule is well established that an offer to settle a criminal prosecution is admissible in evidence. See Collins v. State, 115 Wis. 596, 92 N.W. 266; Scranton v. Henson, 151 Iowa 221, 130 N.W. 1079; Christian v. United States, 5 Cir., 8 F.2d 732, 733, and the state court authorities there cited.[2]

In the Christian case, supra, the circuit court of appeals said: "Although there are authorities to the contrary, we are of opinion that the rule which excludes offers of compromise in civil cases does not apply to criminal cases. The law encourages the settlement of civil suits, but the compounding of crime is against public policy."

In United States v. Picarelli, 2 Cir., 148 F.2d 997, 998, also cited by the Government, the court, in affirming a conviction for unlawful possession of gasoline ration coupons stated: "On the way to the police station, Picarelli [the arrested defendant] pulled his car to the curb and said to the policeman 'Listen, Officer, can't we talk this thing over?' No innocent explanation of this inquiry being vouchsafed, we think the effort to effect a settlement may be regarded as evidencing consciousness of

guilt. Christian v. United States, 5 Cir., 8 F.2d 732, 733; 4 Wigmore, Evidence, 3rd Ed., p. 31. This, coupled with ownership of the car, justified sending the case to the jury."

But, even conceding the correctness of the rule declared in the cited cases, appellant insists that these authorities have no bearing here, for the reason that the settlement by Ecklund of a civil claim based upon the sale by his agent of an automobile at an over-ceiling price would not be evidentiary of an attempt to stifle a criminal prosecution, inasmuch as both civil remedies and criminal sanctions are provided in the Emergency Price Control Act of 1942[3] for violation of price regulations made pursuant thereto and wilful violation is essential to a criminal prosecution,[4] while the civil remedies prescribed are not limited to cases of wilful violations.[5]

This contention is sound. Evidence of a civil-liability settlement previously made by the defendant in a criminal case of this character would have no real probative value to the effect that he had wilfully violated laws and regulations governing sales' prices. The defendant, himself, explained, after evidence of his settlement of the civil case had been received over his objection, that he made the settlement with the Niteks on the advice of his attorney, because he "did not want any unfavorable publicity with reference to that lawsuit." There is no proof whatever that he attempted to avoid criminal liability by settling the civil claim made by the Niteks against him.

It has long been recognized that evidence of an effort to compromise is inadmissible in a civil case. Home Insurance Co. v. Baltimore Warehouse Co. 93 U. S. 527, 548, 23 L.Ed. 868. Why, then, should evidence of the settlement of a civil case be received in a criminal prosecution where the essential ingredients of liability are

---

[2] Huntley v. Snider, 1 Cir., 86 F.2d 539, involving an appeal by a bankrupt from the denial of his discharge in bankruptcy, is not considered to be in point, although cited with emphasis by the Government.
[3] 50 U.S.C.A.Appendix, § 904(a), 56 Stat. 28; 50 U.S.C.A.Appendix, § 942(h),

56 Stat. 36; 50 U.S.C.A.Appendix, § 925 (b), 58 Stat. 640.
[4] 50 U.S.C.A.Appendix, § 925(b).
[5] 50 U.S.C.A.Appendix, § 925(e). DiMelia v. Bowles, 1 Cir., 148 F.2d 725, 726; Talbert v. Sims, 4 Cir., 143 F.2d 958; Bowles v. Lee's Ice Cream, App. D.C., 148 F.2d 113.

wholly at variance, in that no proof of wilful violation is necessary to establish civil liability but is a conditio sine qua non to criminal liability?

The prosecuting attorney distinctly stated that the evidence offered to show that Ecklund had settled the civil action brought against him by the Niteks "was evidence of his knowledge and guilt" in the matter for which he was being criminally prosecuted. In receiving the evidence on the basis stated, the trial judge left the jury under the impression that the settlement by Ecklund of his civil liability *was* evidence of his criminal guilt. The erroneous admission of the prejudicial evidence in this manner could well have tipped the scales against Ecklund in the weighing by the jury of the closely balanced conflicting testimony.

Reversed and remanded for a new trial.