988 P.2d 1153

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Rodolfo GANO, Defendant–Appellant.**

**No. 21819.**

Supreme Court of Hawai'i.

Dec. 8, 1999.

Earle A. Partington (of Partington & Foley), on the briefs, Honolulu, for defendant-appellant.

Shaylene C.L. Iseri-Carvalho, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by MOON, C.J.

On May 13, 1998, a jury found defendant-appellant Rodolfo Gano (Defendant) guilty of: (1) one count of Sexual Assault in the First Degree, in violation of Hawai'i Revised Statutes (HRS) § 707–730(1)(a) (1993);[1] (2) two counts of Sexual Assault in the Third Degree, in violation of HRS § 707–732(1)(e) (1993);[2] and (3) one count of Kidnapping, in violation of HRS § 707–720 (1993).[3] On August 17, 1998, the fifth circuit court entered an Amended Final Judgment[4] against Defendant, sentencing him to twenty years of indeterminate imprisonment. On appeal, Defendant contends that his convictions should be vacated and remanded because the circuit court erred in: (1) ruling that Hawai'i Rules of Evidence (HRE) Rule 408 has no application in criminal cases; (2) admitting hearsay evidence of a proposed settlement offer under HRE Rule 408; and (3) admitting evidence under the adoptive admission exception to the hearsay rule in the absence of a proper foundation. For the reasons discussed below, we agree with Defendant, vacate Defendant's judgment of conviction and sentence, and remand this case for a new trial.

1.  HRS § 707–730 provides in relevant part:
    (1) A person commits the offense of sexual assault in the first degree if:
       (a) The person knowingly subjects another person to an act of sexual penetration by strong compulsion;
       . . . .
    (2) Sexual assault in the first degree is a class A felony.

2.  HRS § 707–732 provides in relevant part:
    (1) A person commits the offense of sexual assault in the third degree if:
       . . . .
       (e) The person knowingly, by strong compulsion, has sexual contact with another person or causes another person to have sexual contact with the actor. . . .
    (2) Sexual assault in the third degree is a class C felony.

3.  HRS § 707–720 provides in relevant part:
    (1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:
       (a) Hold that person for ransom or reward;

## I. BACKGROUND

### A. The Incident

According to the testimony adduced at trial, the following events occurred on January 12, 1997:

Defendant and Complainant were friends. Both were from the Philippines, Defendant having come to the United States in June 1996 and Complainant having arrived in or around 1992. On January 12, 1997, Complainant, then age sixteen, attended Defendant's twenty-second birthday party. After Complainant arrived at the party, Defendant invited her upstairs to the living room, while the "adults" remained downstairs in the garage area. Defendant's first language is Ilocano; however, he spoke to Complainant in her first language, Tagalog. At this point, the accounts of that evening diverge.

According to Complainant's testimony, the following occurred: After watching television for a while, Complainant decided to leave. Defendant encouraged her to stay and invited her to look at pictures from the Philippines in his bedroom. Complainant followed Defendant to the bedroom, and, once inside, Defendant closed the door and turned off the light. Defendant then pushed Complainant onto the bed and laid on top of her. He started kissing her while holding her arms; she was struggling. At some point, Defen-

       (b) Use that person as a shield or hostage;
       (c) Facilitate the commission of a felony or flight thereafter;
       (d) Inflict bodily injury upon that person or subject that person to a sexual offense;
       (e) Terrorize that person or a third person; or
       (f) Interfere with the performance of any governmental or political function.
    (2) Except as provided in subsection (3), kidnapping is a class A felony.
    (3) In a prosecution for kidnapping, it is a defense which reduces the offense to a class B felony that the defendant voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial.

4.  The Amended Judgment and Sentence was filed on August 17, 1998 to correct an erroneous second count of kidnapping in the court's original judgment and sentence.

dant gave her a hickey. Defendant then pushed down her shirt and grabbed her breast; she begged him to let her go. He then put his hand up her shorts while she was struggling and put his finger in her vagina. She did not consent to any of this. She was crying. He then got off of her and turned on the light. After she wiped her face and straightened her clothes, Defendant opened the door, and she went downstairs. The entire incident took less than ten minutes.

According to Defendant's testimony, the following occurred: While watching television, Defendant asked Complainant for a birthday kiss, to which she agreed. At Complainant's suggestion, they went to Defendant's bedroom. After closing the door and turning off the light, he kissed her. She kissed him back, and they laid down on the bed. He admitted that he gave her a hickey on her neck, grabbed her breast, and put his finger in her vagina. However, Defendant stated that at no time did she resist or object, and he denied using force. When she said that she had to leave because of her curfew, he stopped, turned on the light, and they left.

There were no other eyewitness accounts of what occurred in Defendant's room. Although Complainant stated that she scratched Defendant in the struggle and that she had sustained bruises, no evidence was presented to corroborate that testimony.

### B. *The Meeting*

On January 14, 1997, two days after the incident, Complainant told her parents about her encounter with Defendant. The parents and Complainant went that same day to the police station and filed a complaint. Some time prior to February 7, 1997, the police went to the home of the Defendant's aunt, Andrea Gano (Aunt), to question her daughter, who had been a guest at Defendant's party on the night of the incident. Until that time, Aunt was unaware of the incident.

On February 7, 1997, approximately one month after the incident, Aunt spoke with the mother of Complainant (Mother) over the telephone. Apparently, Aunt and Mother were friends. During the conversation, Aunt told Mother that the police had been to her house and asked Mother what was going on.

Upon hearing the allegations, Aunt asked for permission to visit Mother to talk about the incident in person. Mother agreed. Aunt then called Defendant and told him to accompany Aunt to the home of Complainant. Defendant did not want to go. Defendant testified that, when Aunt called him, he did not know why they were going to Complainant's home. It is unclear from the record whether Defendant knew at that time that a complaint had been filed against him or that he understood the nature of what those charges were. Honolulu Police Officer, Sergeant Scott Yagihara, testified that he "believe[d] [he first met Defendant] on February 7th[, 1997]." However, Officer Abadilla, who speaks Ilocano and Tagalog, testified that he was asked to accompany Sergeant Yagihara for a second interview on July 2, 1997 because Sergeant Yagihara had had difficulty conversing with Defendant. Defendant was not indicted until November 17, 1997.

When Defendant and Aunt arrived at Complainant's home on February 7, 1997, Aunt spoke with Mother in Tagalog (Mother did not understand or speak Ilocano) while Defendant stood by idly. Approximately an hour into their conversation, Defendant's cousin, Marylou Iglesia (Cousin), arrived. Aunt, Cousin, and Defendant were at Complainant's home for several hours. At one point during that time, they left and then returned to wait for the father of Complainant (Father) to come home. During the conversation prior to Father's arrival, Aunt, according to Mother's testimony, apparently asked Mother to drop the case. Cousin, separately and in Tagalog, offered money to Mother. Defendant remained silent.

When Father returned home from work, Aunt and Cousin talked to Father, in Tagalog, about the case and offered him money. Father testified that, although Defendant remained silent during the conversation, Defendant was "shaking his head" the entire time. Although the prosecution characterized Defendant's head shake as a "nod," Father did not clarify the manner in which Defendant shook his head—i.e., up and down or side-to-side.

At trial, Aunt denied asking Complainant's parents to drop the charges, and Cousin

denied offering the parents money. Defendant claimed he did not speak, did not hear any offers, and did not ask the parents to drop the charges. Additionally, Defendant testified that, when Mother asked him directly, he affirmatively denied using force upon Complainant.

## C. *The Motion in Limine*

Prior to trial, Defendant filed a Motion in Limine to exclude, among other things, any evidence regarding the meeting of February 7, 1997 [hereinafter, the Meeting]. The prosecutor also filed a Motion in Limine specifically requesting that the circuit court allow presentation of evidence of the Meeting. On May 11, 1998, the trial court heard arguments on the motions in limine:

THE COURT: ... [T]he court understands to a certain degree this is what happened. You correct the Court if the Court is wrong. Okay. The Defendant and two aunts went.

[PROSECUTOR]: A cousin and an aunt.

THE COURT: Oh, a cousin and an aunt went to see the alleged victim's parents. Okay. They stayed approximately an hour.

[PROSECUTOR]: No. Your Honor, it appears that they went there at about two o'clock and stayed till—

[DEFENSE COUNSEL]: Then they left and came back.

[PROSECUTOR]: Yeah, till seven until the father came home—

THE COURT: Seven o'clock at night?

[DEFENSE COUNSEL]: They were waiting for the father.

. . . .

[PROSECUTOR]: And then when the father came home, they stayed till approximately maybe nine o'clock.

THE COURT: Okay, now, the Court understands that when the parents—the father was not there—well, the boy speaks Ilocano.

[DEFENSE COUNSEL]: That's—that's his main language, but I think he speak—

[PROSECUTOR]: He speaks—

[DEFENSE COUNSEL]: —Tagalog too.

[PROSECUTOR]: —Tagalog too.

THE COURT: He speaks Tagalog too, but he speaks Ilocano mainly. The cousin speaks both—

[DEFENSE COUNSEL]: I believe so. I—

THE COURT: —and the aunt speaks both.

[DEFENSE COUNSEL]: I believe so. I—

THE COURT: Okay.

[DEFENSE COUNSEL]: I haven't inquired as to . . .

THE COURT: The victim's mother speaks Tagalog only.

[PROSECUTOR]: That's correct.

THE COURT: Okay. The Court understands that the three of them, while the mother was—only the mother was home, the three of them discussed matters and the aunt would talk in Tagalog to the mother. Right?

[PROSECUTOR]: Yes, the aunt and the cousin.

THE COURT: And the cousin would talk in Tagalog to the mother. And I guess the mother would respond to a certain extent. And then they would whisper things among each other in Ilocano and then she would talk again. Is that correct?

[PROSECUTOR]: That's correct.

THE COURT: The Court understands that the mother will testify that monies were offered. Is that correct?

[PROSECUTOR]: That's correct, in exchange—

THE COURT: To drop the charges.

[PROSECUTOR]: Yes.

THE COURT: Okay. The Court understands likewise, when the father came home, the father, who understands both Ilocano and Tagalog, was informed by the aunt or the cousin, one of the two, of the offer made. *At that time the Defendant nodded his head.*

[PROSECUTOR]: Yes, that's correct.

THE COURT: That's what they're going to testify to. And the offer was refused. How much money was offered?

[PROSECUTOR]: There wasn't a set amount.

THE COURT: But they said—they mentioned money.

[PROSECUTOR]: Yes.

THE COURT: Okay. If that is the testimony, the court will permit the testimony

and, of course, the aunt, the cousin, and the Defendant can rebut whatever happened that evening. Under the circumstances, *it comes in under exception to the hearsay rule because if Defendant adopts what is being said, so to speak, it becomes his own statement. And statements of the Defendant's—the Defendant comes in when it's relevant.*

Now, an offer to drop the charges is circumstantial evidence of the Defendant's guilt, like escape, running away, et cetera, the Court feels that it is more relevant, more probative than prejudicial under the circumstances under [HRE] 403, and therefore, will permit that statement to come in, the transaction....

The Defendant, of course, vigorously objects, saying that it's much more prejudicial than probative, and that it wasn't the Defendant's statement, but that whatever statements were made were that of the aunt and the cousin.

[DEFENSE COUNSEL]: That's correct. Furthermore, I think any type of statement regarding trying to settle the matter with money is, possibility could be negotiations regarding settlement, and I believe that is also prohibited, any type of ...

THE COURT: Maybe in civil cases, but *not in criminal cases* ....

(Emphases added.)

The trial court thus allowed testimonial evidence to be presented regarding the meeting and its contents. At trial and in the presence of the jury, Defendant renewed his objection to testimony regarding the meeting as inadmissible hearsay. Again, the trial court overruled the objection, stating:

[COURT]: ... The Court understands that the ... foundation be laid, that the people conversing with the witness ... discussing the matter with the Defendant, and *at certain times he nodded,* et cetera, *accepting the transmission of information through his cousin* .... Under the circumstances, *Court feels that he adopted the testimony again as his own, or the state-*

*ments as his own. And statements of the Defendant are admissible against him* ....

(Emphases added.)

### D. *The Verdict and Judgment*

On May 13, 1998, the jury returned a verdict of guilty on all counts charged. On June 23, 1998, defense counsel withdrew and new counsel appeared on Defendant's behalf. On August 17, 1998, the trial court entered the final Amended Judgment of guilty and sentenced Defendant to a total of twenty years of imprisonment. Defendant timely appealed.

## II. *STANDARD OF REVIEW*

"The interpretation of a statute is a question of law we review de novo." *State v. Mitsuda,* 86 Hawai'i 37, 40, 947 P.2d 349, 352, *reconsideration denied,* 86 Hawai'i 37, 947 P.2d 349 (1997) (citations omitted). The Hawai'i Rules of Evidence (HRE) are codified at HRS § 626–1, *et seq.* (1993 & Supp.1998). Therefore, the interpretation of the HRE entails a question of law reviewable de novo.

## III. *DISCUSSION*

### A. *HRE Rule 408*

Defendant contends that the circuit court erred in ruling that HRE Rule 408 has no application in criminal proceedings. The prosecution concedes that HRE Rule 408 applies in criminal proceedings, but argues that it did not apply in the instant case because the monetary offer was to "settle" *criminal* charges. Because the circuit court ruled specifically that Rule 408 did "not [apply] in criminal cases," and to clarify the holding in *In the Interest of Doe,* 79 Hawai'i 265, 900 P.2d 1332 (App.1995), we address first the applicability of HRE Rule 408 in criminal cases before considering its applicability in the instant case.

#### 1. **Application of HRE 408, Generally**

Generally, HRE Rule 408 excludes evidence of an offer of valuable consideration in an attempt to compromise or settle a disputed claim if offered to prove liability for or invalidity of the claim. HRE Rule 408 states:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or

offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, or (3) mediation or attempts to mediate a claim which was disputed, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations or mediation proceedings is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations or mediation proceedings. *This rule also does not require exclusion when the evidence is offered for another purpose, such as* proving bias or prejudice of a witness, negativing a contention of undue delay, or *proving an effort to obstruct a criminal investigation or prosecution.*

(Emphases added.)

▆▆▆ "The federal rule, which mirrors the language of HRE Rule 408, was developed to . . . encourage the resolution of problems through negotiation and settlement without the fear of having statements made during the negotiation process haunt a future legal proceeding." *Han v. Yang*, 84 Hawai'i at 171, 931 P.2d at 604 (App.1997) (citing 10 J. Moore, *Moore's Federal Practice* § 408.01[7] (2d ed.1996) (citing S.Rep. No. 650, 93 Cong., 1st Sess. (1973)); *see also McCormick on Evidence* § 266 (J. Strong 4th ed.1992). "The public policy of our appellate courts 'favors the resolution of controversies through compromise or settlement rather than by litigation.'" *Han*, 84 Hawai'i at 167, 931 P.2d at 613 (citations omitted). To allow admissions or evidence of settlement negotiations into evidence "would hamper the negotiation and settlement process of our legal system and is therefore against the public policy of this jurisdiction." *Id.* at 171, 931 P.2d at 613.

a. *HRE Rule 408 applies in criminal proceedings.*

Some courts have held that Rule 408 applies only in civil proceedings because "[t]he reference to a claim which was disputed as to either validity or amount does not easily embrace an attempt to bargain over criminal charges." *See United States v. Baker*, 926 F.2d 179, 180 (2d Cir.1991) (stating that negotiations over immunity from criminal charges or a plea bargain do not ordinarily constitute discussions of a "claim" over which there is a dispute as to "validity" or "amount"); *United States v. Prewitt*, 34 F.3d 436, 439 (7th Cir.1994) (citations omitted) (holding that a clear reading of the rule suggests that it applies only to civil proceedings, specifically the language concerning validity and amount of a claim). However, in addition to the use of the terms "validity" and "claim," the rule specifically states in its final sentence: "This rule also does not require exclusion when the evidence is offered . . . *[to prove]* an effort to obstruct a criminal investigation or prosecution." HRE Rule 408. To construe the rule as applying only in civil proceedings would render the final sentence of the rule unnecessary. *See Keliipuleole v. Wilson*, 85 Hawai'i 217, 221, 941 P.2d 300, 304 (1997) (citations omitted) ("[C]ourts are bound to give effect to all parts of a statute, and . . . no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute."). Accordingly, in construing HRE Rule 408, we must give full force and effect to every sentence in the statute, including the final sentence.

Courts have also held that the policy underlying Rule 408 does not apply to criminal prosecutions because the stakes are higher. *See United States v. Gonzalez*, 748 F.2d 74, 78 (2d Cir.1984) (citing *United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir.1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982)); *see also Manko v. United States*, 87 F.3d 50, 54–55 (2d. Cir.1996). However, we believe that the potential impact of evidence regarding a civil settlement agreement is even more profound in criminal proceedings than it is in civil proceedings. "It does not tax the imagination to envision the juror who retires to deliberate with the notion that[,] if the Defendants had done nothing wrong, they would not have paid the money back." *United States v. Hays*, 872 F.2d 582, 589 (5th Cir.1989).

The Intermediate Court of Appeals (ICA) in *In the Interest of Doe*, 79 Hawai'i 265, 900

P.2d 1332 (App.1995), held that HRE Rule 408 applies in criminal proceedings. *Id.* at 276, 900 P.2d at 1345. In that case, the juvenile-defendant, on trial for assault in the third degree, sought to exclude evidence of a meeting in which the juvenile-complainant and his mother met with the juvenile-defendant and his father to discuss "what happened." In the course of the conversation, the juvenile-defendant made certain admissions that the prosecution sought to adduce as evidence of the juvenile-defendant's guilt. The juvenile-defendant argued that, because the meeting constituted evidence of settlement negotiations, such evidence was inadmissible under HRE Rule 408. *Id.* at 270, 900 P.2d at 1337. The prosecution maintained that the meeting was not a "settlement negotiation," but was instead merely an attempt to determine what had "happened." Without determining whether the parties were attempting to settle civil liability, the trial court allowed testimony only as to the alleged admissions and excluded all testimony regarding negotiations or offers to pay anything. Although the ICA ultimately affirmed the trial court's decision, stating that, "even if the subject testimonies . . . were improperly received, their receipt was harmless error," *id.* at 278, 900 P.2d at 1345, it specifically held that "related compromises or attempts to compromise civil liability are not admissible in a criminal trial because of the danger that such evidence may be taken as criminal guilt." *Id.* at 276, 900 P.2d at 1343 (citing *Ecklund v. United States,* 159 F.2d 81, 84 (6th Cir.1947); *United States v. Meadows,* 598 F.2d 984 (5th Cir.1979); *United States v. Hays,* 872 F.2d 582, 589 (5th Cir.1989)).

■ We agree with the ICA that evidence of compromise of civil liability should be excluded in related criminal prosecutions to avoid the potential inference of criminal guilt because such a policy promotes settlement of disputed civil liability. Furthermore, we believe that the plain language of the rule, which allows evidence of obstruction of criminal investigation or prosecution, implies the applicability of the rule in criminal proceedings. Accordingly, we hold that HRE Rule 408 does apply in criminal proceedings.

b. *HRE Rule 408 does not exclude offers by the accused to the complainant to avoid prosecution.*

■ Not all evidence of civil settlement is excludable under HRE Rule 408. "[B]efore HRE Rule 408 is applied, 'there must be an actual dispute, preferably some negotiations, and at least an apparent difference of view between the parties as to the validity or amount of the claim.'" *In the Interest of Doe,* 79 Hawai'i at 277, 900 P.2d at 1344 (quoting 2 *McCormick on Evidence* § 2661 at 194–95 (J. Strong 4th ed.1992)). Furthermore, evidence of settlements that is offered for a purpose other than to prove liability or the validity of a claim is not excluded. *See* HRE Rule 408. For example, as noted above, if evidence is offered to prove an obstruction of a criminal investigation or prosecution, exclusion is not required. *See* Fed.R.Evid. Rule 408, Advisory Committee's Note (stating that the final sentence of the rule "serves to point out some limitations upon its applicability"). Thus, although we agree with the ICA's holding in *In the Interest of Doe* that HRE Rule 408 applies in criminal proceedings, the rule does not exclude evidence in every circumstance. Specifically, we do not believe that the policy of protecting compromise offers in civil cases is served by protecting an accused who is attempting to "settle" or "compromise" criminal charges by "paying off" the complainant.[5]

---

5. In no way do we question the policy of compromise and negotiations that take place between a prosecuting attorney and an accused, whereby the accused pleads guilty in return for leniency. The legitimacy of plea bargains is well-established and is protected under HRE Rule 410, which states:

Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:

(1) A plea of guilty which was later withdrawn;
(2) A plea of nolo contendere;
(3) Any statement made in the course of any proceedings under Rule 11 of the Hawaii Rules of Penal Procedure or comparable federal or state procedure regarding either of the foregoing pleas; or
(4) Any statements made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

Fed.R.Evid. Rule 408, Advisory Committee's Note (examining the limitations within the final sentence of the identically worded federal rule and noting that "an effort to 'buy off' a . . . prosecuting witness in a criminal case is not within the policy of the rule of exclusion") (citing *McCormick [on Evidence]* § 251, p. 542). Rather, when an accused offers money to a complainant in exchange for "dropping the charges," the public policy against compounding crimes prevails. *See United States v. Peed,* 714 F.2d 7, 9 (4th Cir.1983); *see also* Wright and Graham, Jr., *Federal Practice and Procedure* § 5313 (1980) (citing Wigmore, *Code of Evidence* § 1001 (3d ed.1942)).

The following cases are instructive:

In *Peed,* the defendant sought indemnity from the United States Postal Service for "lost" dolls that she had in fact received. 714 F.2d at 9–10. Confronted with a criminal prosecution for mail fraud and a plea from the sender of the dolls, the defendant promised to return the dolls to the sender if the sender promised to drop the charges. The court, refusing to characterize the defendant's statement as an offer to compromise a civil claim, stated:

> There was no civil suit pending at the time this conversation took place. [The defendant's] jargon ("drop the charges") implies concern over criminal prosecution. These were not negotiations aimed at settling a civil claim, negotiations that the policy behind Rule 408 seeks to encourage. Nor were [the defendant's] statements followed up by any attempt on [the defendant's] part to obtain money or resources for achieving a settlement with [the complainant].

*Peed,* 714 F.2d at 9–10. Thus, the court determined that the defendant's statements were an attempt to avoid criminal prosecution, and, accordingly, the evidence was held admissible. *Id.*

In *New Jersey v. DeAngelis,* 281 N.J.Super. 256, 657 A.2d 447 (App.Div.1995), a restaurant manager stole money from the restaurant in which he worked. When the director of operations for the restaurant discovered the theft, he made a "deal" with the manager that he either pay back the money or be prosecuted. The deal fell through when the manager went to the police and told them he was coerced into admitting theft. As a result, the manager was prosecuted and evidence of the "deal" was ruled admissible. The New Jersey Superior Court held that the "[manager's] promise to repay the missing funds was in reality an attempt to purchase the victim's silence" and, as such, was "more in the nature of an obstruction of justice." *DeAngelis,* 657 A.2d at 450.

By contrast, in *Ecklund v. United States,* 159 F.2d 81 (6th Cir.1947), the defendant, an owner of a car dealership, was criminally prosecuted for violations of the Emergency Price Control Act of 1942. The pivotal issue in the case was whether the defendant had "guilty knowledge" that his salesman was selling an automobile above the lawful ceiling price. Prior to the criminal trial, the defendant settled potential civil liability with the customer to whom his salesman had sold a vehicle. The assistant district attorney sought to admit evidence of the settlement as proof of defendant's guilty knowledge. The United States Court of Appeals for the Sixth Circuit concluded that evidence of the settlement had no real probative value as to whether the defendant had wilfully violated laws and regulations governing sales prices. Furthermore, there was no proof that he had attempted to avoid criminal prosecution by settling the potential civil claim against him. Thus, the court in *Ecklund* held that the defendant's offer to settle the civil claims was not admissible in his criminal trial. *Ecklund,* 159 F.2d at 84–85.

▮ Based on the foregoing, we hold that, in a criminal trial, evidence of an accused's offer to pay value to a complainant in an attempt to avoid prosecution is not excludable under HRE 408. In determining whether an accused is "attempting to avoid

---

However, such a statement is admissible (i) in any proceeding wherein another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it, or (ii) in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record and in the presence of counsel.

prosecution," the court should examine the defendant's statements and the surrounding circumstances to ascertain the defendant's objective. *Cf. In the Interest of Doe,* 79 Hawaiʻi at 277, 900 P.2d at 1344 ("The court, in determining whether negotiations were involved, should look at the declarant's objective in making the statement.") (citing *Myers v. Cohen,* 67 Haw. 389, 396, 688 P.2d 1145, 1150–51 (1984)). Factors relevant to the court's determination include, but are not limited to, whether a civil suit was pending at the time statements were made, whether any reference to criminal prosecution was made, and whether the admission of liability in the civil suit has any probative value as to criminal liability. *See, e.g., Peed,* 714 F.2d at 9–10; *DeAngelis,* 657 A.2d at 450; *Ecklund,* 159 F.2d at 84.

### 2. Application of HRE 408 in the Instant Case

Turning to the instant case, if the February 7, 1997 Meeting constituted civil settlement negotiations, then, in accordance with the above, any evidence thereof would be excluded under HRE Rule 408, unless the evidence constituted an attempt by the accused to avoid criminal prosecution. Defendant argues that the meeting constituted settlement negotiations and was, therefore, inadmissible under Rule 408. The circuit court did not inquire or determine whether the Aunt's or Cousin's statements were made in an effort to compromise potential civil liability. However, based on the prosecution's offer of proof at the motion in limine hearing, the circuit court characterized the statements made at the meeting as an offer of money in exchange for dropping criminal charges that Defendant then adopted by allegedly nodding his head.[6] If the statements made constituted an offer of payment in an attempt to avoid prosecution, then the evidence thereof would not be excluded under HRE Rule 408. However, because Defendant in this case did not make a direct offer but remained silent for most of the meeting and then "shook his head," allegedly in agreement when the offer was being made to Father, we must examine whether

Defendant's nonverbal conduct may have constituted an adoption of his aunt's or cousin's statements under HRE Rule 803.

### B. HRE Rule 803: Adoptive Admissions

### 1. Adoptive Admissions, Generally

HRE Rule 803(a)(1)(B) recognizes that a party may make an admission by adopting the statement of another person. HRE Rule 803 states in relevant part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (a) Admissions.
>
> > (1) Admission by a party-opponent. A statement that is offered against a party and is (A) the party's own statement, in either the party's individual or a representative capacity, or (B) a statement of which the party has manifested the party's adoption or belief in its truth.

In other words, statements made by others that would otherwise be hearsay are admissible as adoptive admissions of the defendant, if the defendant has manifested an adoption of the statement or a belief in its truth. HRE Rule 803(a)(1)(B). The Oregon Supreme Court explained adoptive admissions as follows:

> If a party manifests an adoption of a statement of another, the party is in the same position as if the party had personally made the statement. The party becomes the declarant, and the statement of the other person becomes the party's. Thus, the receipt of evidence of an adoptive admission involves (1) another person's hearsay statement and (2) a party's own manifested adoption of the statement.

*State v. Carlson,* 311 Or. 201, 808 P.2d 1002, 1005–06 (1991) (analyzing whether the defendant's nonverbal reaction—lowering his head and shaking it back and forth—to his girlfriend's accusatory statement was an adoptive admission). The "statement of another" in this case is the alleged offer made by Aunt or Cousin, and the issue is whether Defen-

---

**6.** As more fully discussed *infra,* the judge and the prosecution refer to Defendant's conduct as "nodding"; however, the evidence regarding De-

fendant's conduct reflects only that Defendant was "shaking his head."

dant manifested an adoption of that statement.

Manifestation of an adoption of or belief in the truth of a hearsay statement of another may be express or implied by words or nonverbal conduct. *See* Commentary to HRE Rule 803; *see also McCormick on Evidence* § 160. The Commentary to HRE Rule 803 states:

> Regarding adoptive admissions . . . , the issue for determination by the court . . . is whether the party "manifested his adoption [of] or belief" in the truth of a statement made in his presence. Express assent or agreement presents no problem. When, however, will silence constitute adoption of the statement? . . . [T]he theory is that the person would, under the circumstances, protest the statement made in his presence, if untrue. The decision in each case calls for an evaluation in terms of probable human behavior. In other words, statements made in the presence of a person who is now a party are not invariably "adopted" by that person; the issue is whether, in context, the statement was of such a nature that the person would reasonably have been expected to deny the statement if it were untrue.

(Citation and quotations marks omitted.) Thus, when a party is alleged to have assented by ambiguous nonverbal conduct—for example, by remaining silent—the determination whether a party has "manifested his [or her] adoption [of] or belief" in the truth of a statement requires a closer examination. *See* Commentary to HRE Rule 803; *see also Carlson*, 808 P.2d at 1006 (stating that, "[w]hen it is claimed . . . that a party-litigant has manifested an adoption or a belief by nonverbal conduct and the conduct is susceptible of more than one interpretation, the analysis is more complex").

▇▇ This court previously dealt with the ambiguous nonverbal conduct of silence in *State v. Hoffman*, 73 Haw. 41, 828 P.2d 805 (1992):

> A trial court should be most reluctant to credit mere silence—inherently ambiguous—as conduct sufficient for adoption of an inculpatory statement. Before admitting a proffered admission by silence[,] the trial court must preliminarily determine that the defendant actually heard and com-

prehended the effect of the words spoken and that[,] under the circumstances[,] an innocent Defendant would normally be induced to respond. In its preliminary determination, the court should consider whether any other explanation [is] equally consistent with silence. . . . Failure to deny the statements of others is admissible *only when no other explanation is equally consistent with silence* and there is always another possible explanation—namely, ignorance or dissent—unless the circumstances are such that a dissent would in ordinary experience have been expressed if the communication had not been correct.

*Id.* at 49, 828 P.2d at 810 (emphasis added) (internal citations and quotations marks omitted). Although the nonverbal conduct analyzed in *Hoffman* was silence alone, we believe that in any circumstance in which a defendant's head or other body movement, including silence, is ambiguous, a closer examination is in order. Thus, in accordance with *Hoffman*, whether a defendant manifested an adoption of or belief in the truth of a statement of another by ambiguous nonverbal conduct requires proof that: (1) the defendant actually heard and comprehended the effect of the words spoken; (2) under the circumstances, an innocent defendant would normally be induced to respond; and (3) no other explanation is equally consistent with the defendant's words or conduct.

### 2. Preliminary Determination

Whether a party manifested an adoption of another person's statement is a preliminary question governed by HRE Rule 104. *See* Commentary to HRE Rule 803. Rule 104 provides in relevant part:

(a) Questions of admissibility generally. Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (b). In making its determination the court is not bound by the rules of evidence except those with respect to privileges.

(b) Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to sup-

port a finding of the fulfillment of the condition.

■ In addressing preliminary questions of admissibility under Rule 104(a):

> [T]he judge will of necessity receive evidence pro and con on the issue. The rule ... provides that the rules of evidence in general do not apply to this process ... and that the judge should be empowered to hear any relevant evidence, such as affidavits or other reliable hearsay. This view is reinforced by practical necessity in certain situations. An item, offered and objected to, may itelf be considered in ruling on admissibility, though not yet admitted into evidence.

Commentary to HRE Rule 104 (citing Advisory Committee's Note to Fed.R.Evid. 104(a)). "Where the ... facts necessary [to] admissibility ... are disputed, the offering party has the burden [of proof] ... by a preponderance of the evidence." *State v. McGriff*, 76 Hawai'i 148, 157, 871 P.2d 782, 791 (1994) (citing *Bourjaily v. United States*, 483 U.S. 171, 176, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)).

■ However, when dealing with a matter of conditional relevancy under HRE Rule 104(b),

> factual issues ... are properly within the province of the jury rather than the court, subject to preliminary determination by the court that sufficient foundation has been laid to support a determination by the jury that the condition has been fulfilled. As with other factual determinations, the proponent may offer evidence in support of the condition, the opponent may offer contrary evidence, and the jury rather than the judge must reconcile the dispute.

Commentary to HRE Rule 104. When determining whether sufficient foundation has been laid under HRE Rule 104(b), the judge "neither weighs credibility nor makes a finding that the [proponent] has proved the conditional fact by a preponderance of the evidence." *Huddleston v. United States*, 485 U.S. 681, 690, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). "[T]he court may consider only evidence admissible under the rules of evidence since the jury will have only such evidence before it when it makes the final determina-

tion of the existence of the preliminary fact." *Carlson*, 808 P.2d at 1007 (citations omitted); *see also* Wright and Graham, *Federal Practice and Procedure* § 5055 (Supp.1999).

■ Courts and scholars are split on whether adoption of another's statement is a preliminary question of fact for the trial judge under Rule 104(a) or a question of conditional relevancy under Rule 104(b). *See Carlson*, 808 P.2d at 1007–09 (analyzing this issue to determine whether the defendant's nonverbal conduct constituted an adoptive admission). The Oregon Supreme Court determined that whether a statement is adopted as an admission is a preliminary question of fact for the trial judge based on: (1) the language of the rule; (2) the fact that the question of adoptive admission is one of competency and not of relevancy; and (3) the policy of preventing jury contamination. *Id.* We are persuaded by the reasoning of the court in *Carlson* and adopt that court's analysis herein.

First, the language of HRE Rule 104(a) assigns to the trial judge the responsibility of making preliminary determinations regarding, *inter alia*, the "admissibility of evidence." The commentary to the rule suggests that admissibility of hearsay falls within the scope of HRE Rule 104(a). The adoptive admission sought to be admitted here implicates an exception to the hearsay rule. Thus, whether a person has manifested an adoption of or belief in the truth of another's statement is a preliminary fact to be determined by the judge within the scope of HRE Rule 104(a).

Second, HRE Rule 104 is basically divided between questions of competence (subparagraph (a)) and relevance (subparagraph (b)). Competence, in this context, means "whether evidence is admissible under one of the policy-based exclusionary rules, such as the rule against hearsay." *Carlson*, 808 P.2d at 1008 (citation omitted). The manifestation of adoption of or belief in another's statement "involves a preliminary question of fact on which the competency, and thus the admissibility, of the evidence depends." *Id.* at 1008–09.

Third, the policy of preventing the trier of fact from considering the possible truthful-

ness of out-of-court statements, without sufficient guarantees of trustworthiness, would not be served by sending the determination of the predicate facts to the jury. In weighing whether conduct rose to the level of adoption of or belief in another's statement, the jury would necessarily be made privy to not only the evidence about the conduct and the surrounding circumstances, but also the out-of-court statement itself. If the jury determines that the defendant did not manifest an adoption of the statement, jury contamination would already have occurred, the impact of which would be impossible to determine. *See Carlson,* 808 P.2d at 1009 (citations omitted). Additionally, a general verdict of guilt or acquittal would not apprise the court or the parties as to how the jury resolved the hearsay issue. Thus, appellate review of the jury's finding would be impossible unless a special set of preliminary jury findings were made part of the record. *See id.*

Furthermore, our determination that whether a defendant has adopted a statement is a preliminary question of fact for the trial judge is consistent with the holding in *Hoffman* that, "[b]efore admitting a proffered admission by silence, the trial court must preliminarily determine that the Defendant actually heard and comprehended the effect of the words spoken and that under the circumstances an innocent Defendant would normally be induced to respond." *Hoffman,* 73 Haw. at 49, 828 P.2d at 810. This determination is also consistent with the policy expressed in HRE Rule 104(c), which states: "Hearings on . . . preliminary matters shall be . . . conducted [out of the hearing of the jury] when the interests of justice require. . . ." Accordingly, we hold that whether a defendant has manifested an adoption of or belief in another's statement is a preliminary question of fact for the trial judge under HRE Rule 104(a).

### 3. Application to this Case

We now turn to the facts of this case to determine whether the trial court erred in allowing the hearsay evidence from the Meeting as Defendant's adoptive admission.
▇▇▇ "On appeal, the trial court's determination of preliminary factual issues concerning the admission of evidence will be upheld unless clearly erroneous." *McGriff,* 76 Hawai'i at 157, 871 P.2d at 791 (citation omitted). "A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." *Id.* (citations omitted).

In the present case, the preliminary question of fact was whether the prosecution, as the proponent of the evidence, had established by a preponderance of the evidence that Defendant's nonverbal conduct during the Meeting, consisting of silence throughout the day followed by "shaking his head" as the offer was being related to Father, manifested Defendant's adoption of Aunt's and/or Cousin's statement.

Defendant argues that the prosecution did not lay the proper foundation for an adoptive admission. Based on our review of the transcript of the hearing on the motion in limine, it appears that the trial court did not make a preliminary determination that Defendant manifested an adoption of his Aunt's and/or Cousin's statements at the Meeting. Following the prosecution's offer of proof, the trial court stated:

> THE COURT: The Court understands that the mother will testify that monies were offered . . . to drop the charges . . . when the father came home, [he] . . . was informed by the aunt or the cousin . . . of the offer made. At that time the Defendant nodded his head.
>
> [PROSECUTOR]: Yes, that's correct.

From the record, there does not appear to be a preliminary finding by the court that Defendant understood what was said, would have responded if innocent, and had no other explanation for his conduct. Rather, it appears that the trial court erroneously left the question of Defendant's adoption of the alleged offer to the jury when it stated, "If that is the testimony, the court will permit the testimony and, of course, the aunt, the cousin, and the Defendant can rebut whatever happened that evening." The error, however, is not reversible if the entire evidence in support of an adoptive admission was sufficient to support the finding. We hold that it was not.

The prosecution argues that Defendant was present at the meeting, understood the statements of his Aunt and Cousin, and affirmatively assented to those statements when he "nodded" his head. In support of its position on appeal, the prosecution emphasizes (1) the testimony of Mother to show that the statements were made in the presence of Defendant throughout the day and (2) the testimony of Father to prove that, when the statements were made again upon Father's return from work, Defendant "nodded" his head. However, as previously indicated, Father testified only that Defendant was "shaking" his head, not nodding.

Specifically, on direct examination, Mother testified as follows:

Q: [By the Prosecutor] And what happened when they came to your house?

A: [By Mother] They say sorry.

. . . .

A: They say sorry, and [Aunt] the one who talk to me, not [Defendant].

. . . .

A: She told me ..., you drop the case, not (unintelligible) because you spend plenty money, (unintelligible) and wasting time.

. . . .

Q: Now, when these words were being said by [Cousin], was [Defendant] there?

A: No.

Q: Where was [Defendant]?

. . . .

A: In the room, inside the room. Only me and my [other] daughter [who is not the victim].

Q: So [Defendant]—when did—when did you—you were in the living room, right?

A: Yeah.

Q: Okay. Now, when you were in the living room, how did you end up going into the bedroom?

A: Pardon? (Tagalog spoken)....

Q: Did she make any of these statements while she was—while [Defendant] was there?

A: Yeah. Yes.

On cross-examination Mother further stated:

Q: [By Defense Counsel] Now, would it be correct to say that [Defendant] denied doing anything wrong to your daughter that night?

THE INTERPRETER: (Inaudible) the question.

Q: Did [Defendant] say nothing happened that night?

A: [By Mother]: (Tagalog spoken) [He] never talk, only [Aunt]. [He] never—

Q: But [Aunt] was saying that nothing happened that night; is that correct?

[PROSECUTOR]: Your Honor, we would object as to what happened—what [Aunt is] saying .happened on that night. She wasn't there in the room. So it's irrelevant as to what she thought happened.

THE COURT: Sustained.

Q: [By Defense Counsel]: Okay During this whole time [Defendant] never spoke to you.

A: [By Mother] Yeah. No, she never—he never talk. Only the aunty.

Q: And was he most of the time just sitting there.

A: Yeah, yeah, only sitting and ...

Q: He was just looking around and—

A: Mostly I look in shoulders like this and then if I—

Q: So he was quiet the whole time?

A: Yeah, he's just quiet—

Q: [Defendant] himself never offered to pay you any money to dismiss the case; isn't that correct?

A: No, only the—only the cousin and—I don't know. Only the cousin we talk to each other....

Q: Isn't it true that you tried to get [Defendant] to admit to what happened on January 12th? Is that correct?

A: But he never talk. He never talk.

Father testified as follows:

Q: [By Defense Counsel] And when you came home, all these people were sitting in your living room; is that right?

A: [By Father] Yes.

. . . .

Q: You were just talking about the case, right?

A: Yes.

Q: There was no talk about anything ... besides the case?

A: It's only with the case.

Q: That was it. How long were you there talking to [Aunt] and [Cousin]?

A: More or less 30 minutes.

Q: Thirty minutes. And they went home?

A: Yes.

Q: And you never talked to [Defendant] that evening; would that be correct to say?

A: No.

Q: Okay. You did talk to him?

A: I—

Q: Or did you not talk to him?

A: never talk.

Q: Okay. And so [Cousin] was the one doing all the talking regarding settling the case and paying money and that kind of stuff, right?

A: It is both [Aunt] and [Cousin].

Q: But [Defendant] never said anything, he didn't—he didn't—

A: He never—

Q: —tell you—he didn't say dismiss the case, I'll pay you money, he didn't say anything like that, right?

A: He never say nothing. He just doing like this, *shaking his head.*

Q: So—

A: Whichever—whichever [Cousin] and [Aunt] says, he *always shaking his head.* He never talk nothing.

Q: So the only thing he was doing was *nodding his head,* right? And he was *nodding his head* during the whole conversation?

A: He never talk. He only *shaking his head.* Once [Cousin] and [Aunt] talk, he only *shake his head,* that's it.

Q: For the entire half hour—

A: Yes.

Q: every time [Aunt] or [Cousin] was talking he was *shaking his head?*

A: Yes.

(Emphases added.)

■ In our view, the testimony at trial reveals that Defendant's nonverbal conduct, specifically his silence coupled with the head shake or nod, was ambiguous and, therefore, required a closer examination. Although the prosecution characterizes Father's testimony as indicating that Defendant nodded his head, the record reflects only that Father specifically uses the words "shaking his head" when describing Defendant's conduct. Even assuming that Defendant was nodding his head up and down, indicating affirmance, the record is ambiguous as to whether Defendant was acquiescing to a particular statement, or whether he was acquiescing at all, because he supposedly nodded his head continuously for thirty minutes. Thus, we examine whether the evidence would have supported findings that (1) Defendant actually heard and comprehended the effect of the words spoken, (2) under the circumstances Defendant, if innocent, would have been induced to respond, and (3) no other explanation was equally consistent with Defendant's conduct.

First, the record is unclear as to whether Defendant actually heard and comprehended the effect of the words spoken. From Father's testimony, we know only that Defendant shook his head during the entire time that discussions were taking place about the "case" and offering money. Defendant's response gives little assurance that he adopted, as his own admission, every detail of the lengthy conversation or, more particularly, that he heard, comprehended, and adopted Cousin's alleged offer of money. Mother's testimony was also ambiguous as to whether and when Defendant was present and heard the statement(s). Furthermore, it is unclear whether Defendant comprehended that an offer of money or request to "drop the case" had the effect of implying that he had, in fact, forced Complainant to succumb to his advances during the incident. The record does not clearly show that he knew the complaint against him existed, or that he understood the nature of the crime alleged.

Second, it is unclear whether, under the circumstances, Defendant, if innocent, would have normally been induced to respond to the statements made by his cousin and his aunt. The alleged offer and request to drop the case were accompanied by statements that implied that "dropping the case" was better for the parents of Complainant because they would "save plenty money" and they were "wasting time." These statements

were not accusations or admissions of Defendant's guilt and, therefore, might not have induced Defendant, if innocent, to respond. In fact, it would be equally consistent to infer Defendant's innocence from the assertion that Complainant's family was wasting money and time. The record also does not reflect whether, in a cultural context, at this meeting between two Filipino families, an innocent defendant would be induced to respond to offers made by a family member in the absence of a statement alluding to the guilt or accusation of the defendant. *See* Commentary to HRE Rule 803 ("[T]he issue is whether, in context, the statement was of such a nature that the person would reasonably have been expected to deny the statement if it were untrue."). Cultural norms may have obligated Defendant to attend the Meeting, but he may not have paid attention to the discussions.

Finally, from the record, we cannot say that there was no other explanation for Defendant's conduct. The record does not adequately reflect the particular statement to which he may have been responding. If Defendant was nodding, rather than shaking, his head continually throughout the Meeting, we can hardly say that his nod was a response to a particular statement. His cousin or aunt may have instructed him to be silent. He may not have understood what was transpiring because Tagalog was not his first language.[7] He may have believed that the money was being offered to avoid "wasting time" and "money." Defendant may have wanted to apologize or take responsibility for any trouble he caused even while still denying that he forced the Complainant. Defendant may have been simply acquiescing to the facts as he stated them at trial, without admitting any use of force. With all of these possibilities, we cannot say that there was no explanation for his silence or his continual nodding other than his assent to the offers of his aunt and cousin.

Based on the testimony at the motion in limine hearing, the trial court did not make an adequate preliminary determination as to whether Defendant had adopted the statements of Aunt or Cousin as his own. Considering the totality of the evidence adduced at trial in support of the trial court's finding of an "adoptive admission," we hold that Defendant's nonverbal reaction was so ambiguous that it cannot reasonably be deemed sufficient to establish that Defendant manifested an adoption of his Aunt's or Cousin's statements as his own. Without that determination, the evidence of the Meeting lacked proper foundation and constituted irrelevant and inadmissible hearsay. Accordingly, we hold that the evidence of the meeting and the statements allegedly made thereat were erroneously admitted.

## C. *Harmless Error*

We are then faced with the question whether the erroneous admission of evidence was harmless.

> [E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in light of the entire proceedings and given the effect to which the whole record shows it is entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.

*State v. Heard,* 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted). "If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside." *State v. Pulse,* 83 Hawai'i 229, 248, 925 P.2d 797, 816 (1996) (citations omitted).

Having reviewed the record in its entirety, we are not convinced that the error in this case was harmless beyond a reasonable doubt. The inadmissible evidence contributed to the credibility of Complainant's testimony and the inference of Defendant's admitted guilt. Without it, the jury was left essentially to weigh Defendant's words against the words of Complainant. The prosecution asserts that the testimony of Defendant alone was enough for the jury to convict. We disagree. Both Defendant and

---

7. Although Defendant testified that he spoke Tagalog, no inquiry was made as to the extent of his language capabilities. He also testified that he spoke English; yet, he requested an interpreter at his arraignment (and was not given one), experienced difficulties with language at trial, and used an interpreter at his sentencing hearing.

Complainant agree as to the specific acts that were performed, but they disagree as to whether the acts were performed by force or "strong compulsion," a material element of one of the offenses with which he was charged. As previously indicated, Defendant testified that he did not force or threaten the Complainant, whereas the Complainant testified that she resisted and was forced. To paraphrase the court in *Hays*, it does not tax the imagination to envision the juror who retires to deliberate with the notion that, if Defendant had done nothing wrong, he would not have gone with his aunt and cousin to offer money to drop the charges. *See Hays*, 872 F.2d at 589. There was more than a reasonable possibility that this evidence may have weighed against Defendant's credibility and, therefore, contributed to his conviction. Accordingly, we cannot say that the admission of the evidence was harmless beyond a reasonable doubt.

### IV. *CONCLUSION*

Based on the foregoing, we vacate the circuit court's judgment and sentence and remand this case for a new trial.