90 P.3d 1256

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Raquel BERMISA, Defendant–Appellant.**

No. 24046.

Intermediate Court of Appeals of Hawai'i.

May 7, 2004.

Joyce K. Mastumori–Hoshijo, Deputy Public Defender, on the briefs, for defendant-appellant.

Dewey H. Kim, Michael L. Parrish, and Gary K. Senaga, Deputy Attorneys General; and Donn Fudo, Special Deputy Attorney General, on the briefs, for plaintiff-appellee.

WATANABE, Acting C.J., and FOLEY, J., and LIM, J., concurring separately.

Opinion of the Court by FOLEY, J.

Defendant–Appellant Raquel Bermisa (Bermisa) appeals from the Judgment filed January 10, 2001 in the Circuit Court of the First Circuit (circuit court).[1] Bermisa was charged with and convicted of Manslaughter, in violation of Hawaii Revised Statutes (HRS) §§ 707–702(1)(a) (1993 & Supp.2002)[2] and 702–203(2)[3] (1993).[4]

On appeal, Bermisa argues: (1) the circuit court abused its discretion by admitting Paul Tomas's testimony regarding Bermisa's prior Department of Health violations; (2) the circuit court plainly erred by permitting Tamar Solinger to offer improper lay witness testimony that Bermisa abused Chiyeko Tanouye; (3) the circuit court erred or plainly erred by admitting the testimonies of Luz Sanqui, Shirley Souza, and Paul Tomas to establish that Bermisa had education and training about decubitus ulcers; and (4) the State failed to adduce sufficient evidence to prove Bermisa had the requisite state of mind to convict her of Manslaughter by omission.

We conclude (1) the circuit court did not abuse its discretion by admitting the testimony of Paul Tomas regarding Bermisa's prior Department of Health violations; (2) the circuit court did not plainly err by admitting Tamar Solinger's testimony into evidence; (3) the circuit court did not err or plainly err by admitting the testimonies of Luz Sanqui, Shirley Souza, and Paul Tomas; and (4) there was sufficient evidence to prove Bermisa had the requisite state of mind to commit Manslaughter by omission.

Therefore, we affirm the January 10, 2001 Judgment of the circuit court.

## I.

This case arises out of the death of Chiyeko Tanouye (Tanouye), who was eighty years old and a resident in Bermisa's adult residential care home at the time of her death.

On March 26, 1999, Tanouye was admitted to Hale Nani rehabilitation and care facility.

---

1. The Honorable Marie N. Milks presided.

2. Hawaii Revised Statutes (HRS) § 707–702 (1993 & Supp.2002) reads in relevant part:
   § 707–702 Manslaughter. (1) A person commits the offense of manslaughter if:
   (a) He [or she] recklessly causes the death of another person[.]
   . . . .
   (3) Manslaughter is a class A felony.

3. This HRS section number is incorrect on the Judgment. The Complaint charged Bermisa with § 702–203(2), but the Judgment convicts her of § 707–203(2). The circuit court is hereby ordered to file an Amended Judgment setting forth the correct HRS section.

4. HRS § 702–203(2) (1993) reads as follows:
   § 702–203 Penal liability based on an omission. Penal liability may not be based on an omission unaccompanied by action unless:
   . . . .
   (2) A duty to perform the omitted act is otherwise imposed by law.

Tanouye did not have "pressure ulcers" (decubitus ulcers) [5] while at Hale Nani. Tanouye was discharged from Hale Nani on May 3, 1999 directly into Bermisa's adult residential care home.

On June 30, 1999, Bermisa took Tanouye to see Dr. Kim for a urinary tract infection. Dr. Kim diagnosed Tanouye as having a urinary tract infection and a five-by-six centimeter decubitus ulcer. Dr. Kim instructed Bermisa to wash the ulcer with Betadine (cleaning solution) and apply Intrasite gel (medicated gel to help heal the wound) and a Duoderm (a gel dressing pad) every day. On July 7, 1999, Bermisa took Tanouye to a follow-up visit with Dr. Kim. Tanouye's urinary tract infection had cleared up, but the decubitus ulcer was still present. Dr. Kim referred Tanouye to Dr. Robinson for treatment of the decubitus ulcer.

On July 9, 1999, Bermisa took Tanouye to see Dr. Robinson. Dr. Robinson diagnosed Tanouye as having two decubitus ulcers with necrotic (dead tissue) areas one-to-two centimeters in diameter in each ulcer. Dr. Robinson provided Bermisa with written information about decubitus ulcers. Dr. Robinson testified Bermisa did not indicate to him that she did not understand what he was saying, or that she could not understand or read English. Dr. Robinson debrided (cut out) the dead tissue in each ulcer to prevent bacteria from growing under the skin (bacteria would cause a systemic infection) and applied a sterile gauze with moistening saline over each area. Dr. Robinson testified that he instructed Bermisa to "do dressing changes with gauze moistened with saline" two or three times a day. Bermisa testified that Dr. Robinson instructed her to keep the ulcer clean, wash with Betadine, and apply Intrasite gel and Duoderm. Dr. Robinson instructed Bermisa to bring Tanouye back in one week. Tanouye did not return for a follow-up visit, and the next time Dr. Robinson saw Tanouye was in the intensive care unit at Pali Momi on August 9, 1999—one month later.

On August 9, 1999, Bermisa took Tanouye to Pali Momi emergency room (ER). Tamar Solinger (Solinger), a nurse at Pali Momi, testified that Tanouye was slumped over in the front seat of a car outside of the ER. Tanouye had no pulse and was not breathing. As the ER staff began working on Tanouye, they noticed decubitus ulcers on her coccyx and sacral area and one of her heels. Solinger described the ulcers as large and black with pus coming out. There was also a "really horrible" smell. Solinger testified that "[t]here was not Duoderm" on the ulcers. Dr. Williams, a physician at Pali Momi, testified that he saw Tanouye in the intensive care unit with decubitus ulcers on her lower back, left leg, and left heel. One day later, on August 10, 1999, Tanouye died.

Shirley Souza (Souza) testified that she was a registered nurse (RN) and unit supervisor with the Hawai'i Department of Health (DOH), Office of Health Care Assurance and State Licensing Section. Souza supervised staff and reviewed applications and applicants for adult residential care homes. Souza testified she thought Bermisa knew about decubitus ulcers based on (1) Bermisa's having obtained a Certified Nurse's Aide (CNA) card and having completed an Adult Residential Care Home teaching module specifically geared toward common diseases, (2) Bermisa's work experience at Hale Nani, and (3) a written submission from Hale Nani stating that Bermisa had learned the type of care to be given to patients.

Luz Sanqui (Sanqui), formerly a Certified Nurse's Aide (CNA) and presently a registered nurse at Hale Nani, testified that CNAs at Hale Nani receive instruction and training on decubitus ulcers.

Paul Tomas (Tomas), a registered nurse, had formerly been employed as a nurse consultant by the DOH, where he monitored licensed adult residential care homes. Tomas conducted an inspection of Bermisa's care home on April 20, 1999 and found four violations. Tomas testified that because of a complaint allegation involving Tanouye, he returned to Bermisa's care home on August

---

**5.** A decubitus ulcer is defined as "an ulceration caused by prolonged pressure in a patient allowed to lie too still in bed for a long period of time; called also ... bed sore, and pressure sore." *The Sloane–Dorland Annotated Medical–Legal Dictionary* 757 (1987).

11, 1999. Bermisa's records on Tanouye were incomplete; there were no medication or treatment records for Tanouye. Tomas testified that the written Bermisa Care Home Policy (Contract) signed by Bermisa and Tanouye (State's Exhibit 26 in evidence) set out the duties of the care home operator and resident and the resident's rights. The care home operator was required by the DOH to have this document. Tomas also testified he knew that Bermisa had been taught about preventing decubitus ulcers because she had to have completed the training at Kapiolani Community College (KCC) and worked as a nurse's aide in a long-term care facility or acute care hospital under the supervision of a registered nurse to get her care home license. The training at KCC would have taught her, among other things, how to take care of a resident, the disease process, prevention, and medication administration.

Bermisa testified that:

1. She had completed a three-month CNA course at KCC and had received her nurse's aide certification in 1993.

2. On April 1, 1993, she had completed "Use of Decubitus Prevention Aids" in her course at KCC.

3. After completing the KCC course, Bermisa worked at Hale Nani as a CNA for sixteen months where she helped patients with activities of daily living.

4. At Hale Nani, a substantial portion of her training was specifically directed toward care and prevention of decubitus ulcers.

5. She had received training in basic first aid and in the care of decubitus ulcers, and she knew that decubitus ulcers had to be kept clean and dry and free from dirt and that an open wound could lead to infection.

6. Her in-service attendance record from Hale Nani showed that she did not take the course in decubitus care.

7. At Hale Nani she had taken a written test, which asked questions about decubitus ulcers; however, she had answered two of the questions on decubitus ulcers wrong.

8. She received a care home license in August 1995.

9. She was aware of the Hawaii Administrative Rules (HAR) governing adult residential care homes, knew she was required by law to comply with the rules, and had cited the rules in the Contract (State's Ex. 26) she and Tanouye had signed.

10. She was aware that, under the Contract, she was responsible for taking Tanouye to additional doctors at the recommendation of Tanouye's attending physician; however, she claimed that she and Tanouye's nephew had an oral agreement that the nephew would take Tanouye to the doctor.

11. During the time that Tanouye lived at the care home, Bermisa took her to the doctor six times.

12. At the end of June 1999, Tanouye could not walk by herself or scrub her back; Bermisa would wash Tanouye's upper and lower back.

13. When she took Tanouye to Dr. Kim on June 26, Dr. Kim prescribed antibiotics for Tanouye's urinary tract infection, told her Tanouye had a decubitus ulcer, gave Bermisa specific instructions on how to treat the ulcer, and instructed Bermisa to bring Tanouye back in one week.

14. When she took Tanouye for the follow-up visit with Dr. Kim on June 30, the decubitus ulcer had "gotten bigger," and Dr. Kim referred Tanouye to Dr. Robinson.

15. After the June 30 visit to Dr. Kim, the decubitus ulcer became a "wound" (by which Bermisa meant "open cut") two-to-four centimeters across, and Bermisa had been trained that an open wound could lead to infection.

16. On the July 9, 1999 visit to Dr. Robinson, she went into the examining room with Tanouye, where she saw Dr. Robinson examine the "wound" and "probably touch it"; she did not see Dr. Robinson debride the decubitus ulcer.

17. At this point, the decubitus ulcer looked "pinkish, like similar to a cut."

18. Dr. Robinson told her to keep the decubitus ulcer "clean at all times, wash it with Betadine, and prescribed Intrasite gel and Duoderm to treat the decubitus ulcer."

19. She knew that Betadine was "some kind of an antiseptic" to clean out wounds, Intrasite gel was a medicated gel to be applied directly to the wound to heal it, and Duoderm was similar to a large Band–Aid to cover a wound.

20. She knew from her certification and training that the purpose of covering a wound was to prevent infection; she was aware that a person who had an infection could die.

21. She asked Dr. Robinson for a prescription for an egg crate mattress for Tanouye's bed and a cushion for her wheelchair; Bermisa knew that an egg crate mattress was to help people with decubitus ulcers.

22. She did not make a follow-up appointment with Dr. Robinson; Tanouye told her nephew during a telephone conversation that the nephew was to take her to the follow-up appointment.

23. Dr. Robinson's nurse called Bermisa to say that Tanouye's nephew did not bring Tanouye in for the follow-up appointment on July 16.

24. At this point, no one mentioned to her that decubitus ulcers were serious or life threatening and that she should have brought Tanouye back in a week.

25. By July 16, the decubitus ulcers had gotten bigger.

26. She made an appointment to take Tanouye back to Dr. Robinson on August 11, 1999; that date was picked because Tanouye had another doctor's appointment at a different time scheduled for that day.

27. On July 20, she was still treating the decubitus ulcers with Intrasite gel and Duoderm; although the ulcers had gotten bigger, their color had not changed, no pus was coming out, and there was no foul smell.

28. The last week of July or early August, the decubitus ulcers began to look like a scab, and by August 9, they were a grayish color.

29. In late July/early August 1999, she had no personal health problems, her telephone worked, she knew where Dr. Robinson's office was and how to contact all of Tanouye's doctors by telephone, and she understood that it was her duty, not the duty of Tanouye's nephew, to take Tanouye to the doctor.

30. On the morning of August 9, Bermisa had helped Tanouye bathe, cleaned the decubitus ulcers and put the Intrasite gel and Duoderm on them; there was no foul smell or pus from the ulcers.

When directly asked if she had ever seen a decubitus ulcer in her entire life, Bermisa first stated that she did not remember. Then she stated that she had never seen an ulcer until she saw Tanouye's ulcers.

## II.

### A. The Admissibility of the Evidence

#### 1. Right/Wrong

In *State v. West*, 95 Hawai'i 452, 24 P.3d 648 (2001), the Hawai'i Supreme Court stated:

> [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

*Id.* at 456–57, 24 P.3d at 652–53 (quoting *Kealoha v. County of Hawaii*, 74 Haw. 308, 319–20, 844 P.2d 670, 676 (1993)).

"Under the right/wrong standard, [the appellate court] examine[s] the facts and answer[s] the question without being required to give any weight to the trial court's answer to it." *State v. Timoteo*, 87 Hawai'i 108, 113, 952 P.2d 865, 870 (1997) (internal quotation marks and citation omitted; bracketed material not in original).

A trial court's determination that evidence is "relevant" is reviewed under the right/wrong standard of review. *State v. Pulse*, 83 Hawai'i 229, 247, 925 P.2d 797, 815, *amended*

*on reconsideration in part*, 83 Hawai'i 545, 928 P.2d 39 (1996). In contrast,

> [e]videntiary decisions based on HRE [Hawaii Rules of Evidence] Rule 403, which require a "judgment call" on the part of the trial court, are reviewed for an abuse of discretion. HRE 404 represents a particularized application of the principle of HRE 403 (*see* Commentary to HRE 404), and we will employ the same abuse of discretion standard of review.

*State v. Richie*, 88 Hawai'i 19, 37, 960 P.2d 1227, 1245 (1998) (internal quotation marks, citations, and footnotes omitted).

### 2. Abuse of Discretion

■ We apply two different standards of review in addressing evidentiary issues. Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard.

*State v. Ortiz*, 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999) (citations and internal quotation signals omitted). "An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Lee*, 90 Hawai'i 130, 134, 976 P.2d 444, 448, *cert. denied*, 528 U.S. 821, 120 S.Ct. 65, 145 L.Ed.2d 56 (1999) (citations and internal quotation signals omitted).

*State v. Culkin*, 97 Hawai'i 206, 213, 35 P.3d 233, 240 (2001).

### B. Admissibility of Opinion Evidence

■ "In Hawaii, admission of opinion evidence is a matter within the discretion of the trial court, and only an abuse of that discretion can result in reversal." *State v. Tucker*, 10 Haw.App. 73, 89, 861 P.2d 37, 46 (1993) (reviewing for abuse of discretion evidence admitted pursuant to Hawaii Rules of Evidence (HRE) Rule 701).

### C. Plain Error/Hawai'i Rules of Penal Procedure Rule 52(b)

Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) states that "[p]lain errors or de-

fects affecting substantial rights may be noticed although they were not brought to the attention of the court." Therefore, an appellate court "may recognize plain error when the error committed affects substantial rights of the defendant." *State v. Davia*, 87 Hawai'i 249, 253, 953 P.2d 1347, 1351 (1998).

■ The appellate court "will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *State v. Vanstory*, 91 Hawai'i 33, 42, 979 P.2d 1059, 1068 (1999) (internal quotation marks and citation omitted).

> This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes.

*Id.* (quoting *State v. Kelekolio*, 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993)).

### D. Sufficiency of the Evidence

We review the sufficiency of evidence on appeal as follows:

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Quitog*, 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997) (quoting *State v. Eastman*, 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996)) (emphasis omitted). " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable

caution to support a conclusion." *Eastman*, 81 Hawai'i at 135, 913 P.2d at 61. *Richie*, 88 Hawai'i at 33, 960 P.2d at 1241.

## III.

### A. The circuit court did not err by admitting Tomas's testimony about the violations found in a DOH inspection report of Bermisa's care home.

■ Bermisa contends the circuit court erred when it admitted testimony from Tomas about four violations found during an April 20, 1999 DOH inspection of the Bermisa care home. The State contends the violations found during the inspection and the inspection report itself are circumstantial evidence that goes to the state of mind of Bermisa and her credibility.

Bermisa's motion in limine to exclude evidence relating to Bermisa's prior DOH investigations, reports or allegations of prior similar patient abuse or nursing home misconduct was denied; however, the State's use of this evidence was conditioned upon the State laying the proper foundation at trial.[6] Tomas was permitted to testify about three of the four violations he found during his inspection. Tomas's testimony about the fourth violation, referencing Bermisa's failure to record dates of patient menus and inappropriate meal content, was stricken from the record after defense counsel objected.

The State proffered that the reason it introduced the inspection violations was to show a reckless state of mind and to contradict the credibility of Bermisa. Contrary to Bermisa's claim, the violations found in the April 20, 1999 DOH inspection were still at issue when Tanouye entered Bermisa's care home. Tanouye resided at the care home from May 3, 1999 to August 9, 1999. A written plan of correction for the violations was sent to Bermisa on July 28, 1999. After receiving the plan of correction, Bermisa was required to complete and return it to the DOH within ten days. The DOH had not resolved the violations of the Bermisa care home when Tanouye began residing there.

Bermisa contends the three violations should have been excluded because they did not come within the exception to HRE Rule 404(b) (Supp.2003). Bermisa claims the exceptions to HRE Rule 404(b) only go to a knowing state of mind and cannot be used to show a reckless state of mind.

The instruction given by agreement to the jury stated in part: "In any prosecution for an offense, it is a defense that the Defendant engaged in the prohibited conduct under ignorance or mistake of fact, if the ignorance or mistake of fact negatives the state of mind required to establish an element of the offense." Bermisa claimed mistake or accident as a defense to negate the element of a reckless state of mind. Absence of mistake is specifically listed as an exception under HRE Rule 404(b). It was appropriate for the State to offer evidence of the violations to show an absence of mistake under HRE Rule 404(b) in order to negate Bermisa's defense of mistake.

■ Bermisa contends the three violations were too prejudicial and should have been excluded under HRE Rule 403, which states in part that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."

The ongoing DOH violations had probative value as to Bermisa's reckless state of mind, which outweighed any danger of unfair prejudice to Bermisa. The circuit court did not abuse its discretion in admitting the testimony of Tomas regarding the three violations found during his inspection of the Bermisa care home.

### B. It was not plain error to admit the testimony of Solinger because she did not opine that Bermisa abused Tanouye.

■ Bermisa contends the admission of Solinger's testimony that Tanouye was a victim of elder abuse by Bermisa was improper lay opinion and constituted plain error. The State contends it was not plain error to admit Solinger's testimony because her testimony

---

**6.** Defense counsel did not object to the lack of proper foundation at trial. Therefore, this point

is waived. *Craft v. Peebles*, 78 Hawai'i 287, 294, 893 P.2d 138, 145 (1995).

was not used to prove that Tanouye had been a victim of elder abuse. The State contends the testimony was used to explain Solinger's reason for not believing Bermisa's statement about the events leading to Tanouye's arrival at the ER.

Bermisa did not object to the introduction of Solinger's testimony. Therefore, this court reviews the admission of Solinger's testimony under the plain error standard of review. *State v. Vliet*, 91 Hawai'i 288, 299, 983 P.2d 189, 200 (1999).

Solinger's testimony stated in relevant part:

Q. [DEPUTY ATTORNEY GENERAL (DAG)] Let's back up a little bit. When you first saw the defendant, what observations if any were you able to make with respect to her demeanor?

A. [SOLINGER] She appeared very calm. And she was walking—she wasn't running. She was walking just at a normal pace to the car. And she opened the car for me. So my initial—a lot of times as a nurse, you pick up speed if the people who are there are very concerned and they're obviously running, and you sort of reflect that. So initially I wasn't that concerned because I saw her first. And then when I saw the patient in the car, I became more concerned.

. . . .

Q. And what—during this particular time, did you have occasion to make any observations with respect to the defendant's demeanor?

A. She seemed concerned, and she was calm.

Q. When you say concerned, what things led you to believe she was concerned?

A. She said that she cared for her, and that she'd been taking care of her for quite a while. And she felt very close to her. She seemed—I don't remember her exact words, but the gist was that, you know, she was like family to her. That was kind of the feeling. And I mean that's the way that several of us were impressed that she was concerned about the patient.

Q. And was there anything that struck you as unusual or extraordinary about the concern she expressed?

A. Not at the time. Not until we saw her wounds.

. . . .

Q. What did you notice?

A. Well, actually, when we removed her diaper, there was a really, really foul odor that was coming from her bottom. And when we turned her over, she had large decubiti, which is a fancy name for bed sores, on her sacral—on her lower back and her bottom, the top. And on her heel there was pus coming out. They were black. They were necrotic.

The smell was really rather—it was really horrible. I mean I'm a nurse, I've been around it a long time. But it was a really overwhelming smell.

. . . .

Q. Now, earlier you had testified with respect to the defendant's demeanor, and somehow in your mind something may have been off once you realized the sores were there. Can you tell me what you mean about that?

A. Well, the defendant was just very concerned and, you know, was there and talking. And I mean really came across as very caring and very loving. But when I saw the bed sores, it was kind of shocking. A lot of times when you have patients there are a lot of care home operators who are there and care a lot for the people they take care of. And their patients usually don't have those kinds of conditions. They're well taken care of. Their skin is intact. And they're in good shape. And she was not. She was not in good shape.

So it rings alarm bells. I mean we have—we see abusive children and adults. And it rang alarm bells for me.

. . . .

Q. Now, in this particular case, Mrs. Tanouye—you obviously couldn't get a patient history from Mrs. Tanouye. One was obtained from the defendant.

A. Yes.

Q. With respect to that, the history that was given that immediately proceeded

[sic] Mrs. Tanouye being dropped off at the emergency room was what?

A. That she had been picked up from a day care center, and that they were going shopping at the mall. Pali Momi is right across from one of the malls in Aiea, in Pearl City.

Q. Pearl Ridge?

A. At Pearl Ridge, yeah. So she said that she was taking the ladies shopping.

Q. Based on your observations of Mrs. Tanouye, her wounds and her general condition, did the history that was given square with what you saw?

[DEFENSE COUNSEL]: Objection, Lack of foundation.

THE COURT: Sustained.

BY [DAG]:

Q. Did you find anything unusual about the history that was given in light of the things you saw?

[DEFENSE COUNSEL]: Same objection, Your Honor.

THE COURT: Overruled.

A. Yes, I did. The patient's wounds were so severe that it would have been extremely painful, had she had any pain, for her to be even sitting in a wheelchair. So I thought it was unusual that she would have been taking them shopping. And the woman was obviously really ill. So it struck me as unusual and strange. And again, just, you know, alarm bells kind of went off.

Solinger did not offer an opinion that Bermisa abused Tanouye. Solinger compared the condition of Tanouye with patients who were abused for the purpose of describing the demeanor of Bermisa and questioning Bermisa's statement that she and Tanouye were on their way to go shopping. The admission of Solinger's testimony was not plain error.

**C. It was not error or plain error to admit the testimonies of Sanqui, Souza, and Tomas.**

In her opening brief, Bermisa contends the

lower court erred or plainly erred in admitting the testimonies of Luz Sanqui, Shirley Souza, and the rebuttal testimony of Paul Tomas to establish Mrs. Bermisa's education and training about decubitus ulcers which were lacking in foundation and constituted impermissible lay opinion and hearsay.[7]

(Footnote added.)

**1. Sanqui's Testimony.**

Bermisa's point of error in her opening brief as to Sanqui's testimony is as follows:

During the direct examination of Luz Sanqui, a registered nurse and [sic] Hale Nani Health Center, defense counsel objected as follows:

[DAG]: Okay, But are they also aware that that patient is at risk for infection?

[DEFENSE COUNSEL]: Your Honor, objection. Leading.

THE COURT: Leading, form.

[DAG]: What else—what I'm trying to ask—what I'm trying to find out from you is, why is it important for a[CNA], or even an RN, at Hale Nani to take care of a patient who has bed sores?

[WITNESS]: Because one complication is if the bed sore will not be treated, it—she might have—I'm not a doctor, but she might have—

[DEFENSE COUNSEL]: Your Honor, objection.

A. —sepsis.[8]

THE COURT: This is from the nurse's point. I'll permit it.

10/20/99 TR: 131.

Ms. Sanqui testified as follows. 10/20/00 TR: 127. She never worked with Mrs. Bermisa at Hale Nani. *Id.:* 127. As to the duties of a[CNA] at Hale Nani, they are

---

7. Sanqui, Souza and Tomas were not qualified as expert witnesses on decubitus ulcers pursuant to Hawaii Rules of Evidence (HRE) Rules 104(a) and 702.

8. Sepsis is defined as "a toxic condition resulting from the spread of bacteria or their products from a focus of infection." *Merriam Webster's Collegiate Dictionary* 1064 (10th ed.2000).

trained to know, among other things, that the patients are at risk for decubitus and infection. *Id.:* 129–130. As to the treatment for decubitus ulcers, they are taught to position the patient every two hours and to keep them dry and clean as much as possible. *Id.:* 130. When asked by the DAG why it is important for a CNA at Hale Nani to take care of a patient with bedsores, Ms. Sanqui replied that a complication is sepsis and "she will have infection all over her system. And because those elderly have poor body immune system already, so they're very risk for that." *Id.:* 131.

(Footnote added.)

Sanqui testified as follows: She had worked at Hale Nani for fifteen years as a CNA and registered nurse and was familiar with the duties of a CNA. CNAs were trained in the importance of personal and nursing care of the patient, including safety, sanitation, toilet care, and positioning of the patient to prevent bedsores. CNAs were instructed on the importance of documenting and reporting changes in the patient's health and condition to alert the doctor about treatment of the patient. A CNA did all these things at Hale Nani to make a patient safe and comfortable and to prevent complications (such as decubitus ulcers). CNAs were trained to be aware that patients were at risk for decubitus ulcers and that patients at Hale Nani were at a high risk for infection.

Sanqui further testified: CNAs at Hale Nani were taught about the care and treatment of decubitus ulcers, including prevention. CNAs were taught to position a patient every two hours and keep the patient dry and clean. CNAs were informed of patients at risk for decubitus ulcers and of the importance of taking care of patients who had bedsores to aid in healing the bedsores. At this point in Sanqui's testimony, Bermisa made her objection when Sanqui was asked why it was important to take care of a patient who had bedsores:

Q. [DAG] What does a CNA have to know in order to care for that patient? Do you understand my question?

A. [SANQUI] What do they need to know?

Q. Yes. Why is it important that they take care of a patient who has a sore?

A. So it will aid in healing the decubitus easily.

Q. Okay. But are they also aware that that patient is at risk for infection?

[DEFENSE COUNSEL]: Your Honor, objection. Leading.

THE COURT: Leading, form.

BY: [DAG]:

Q. What else—what I'm trying to ask—what I'm trying to find out from you is, why is it important for a[CNA], or even an RN, at Hale Nani to take care of a patient who has bed sores?

A. Because one complication is if the bed sore will not be treated, it—she might have—I'm not a doctor, but she might have—

[DEFENSE COUNSEL]: Your Honor, objection.

A. —sepsis.

THE COURT: This is from the nurse's point. I'm [sic] permit it.

A. Yeah it will—she will have infection all over her system. And because those elderly have poor body immune system already, so they're very risk [sic] for that.

Q. So you have this awareness as a[CNA]?

A. Yes.

Q. And now that you're a Registered Nurse, you have more training and know this even more?

A. Yes.

Hawaii Rules of Evidence Rule 701 provides:

> **Rule 701 Opinion testimony by lay witnesses.** If the witness is not testifying as an expert, the witness' [sic] testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of the witness' [sic] testimony or the determination of a fact in issue.

In *State v. Jenkins*, 93 Hawai'i 87, 997 P.2d 13 (2000), the Hawai'i Supreme Court set forth the following standard:

HRE Rule 701 thus sets forth a liberal standard for admitting lay opinions into evidence. As long as (1) the witness has personal knowledge of matter that forms the basis of the testimony; (2) the testimony is rationally based on the witness' [sic] perception; and (3) the opinion is "helpful" to the jury (the principal test), the opinion testimony is admissible.

*Id.* at 105, 997 P.2d at 31 (quoting *Tucker*, 10 Haw.App. at 91, 861 P.2d at 47).

Sanqui's testimony about the training and instruction of CNAs at Hale Nani was based on her observations and personal knowledge as a CNA and RN at Hale Nani. It was not testimony in the form of opinion or inference, with the exception of Sanqui's opinion on the complications to the elderly when bedsores are not properly treated. This testimony seems to have strayed from the confines of HRE Rule 701 (governing lay opinion) to the " 'scientific, technical, or other specialized knowledge' such that expert testimony would have been required pursuant to HRE Rule 702." *Jenkins*, 93 Hawai'i at 105, 997 P.2d at 31. This error, however, was harmless error. *State v. Gano*, 92 Hawai'i 161, 176, 988 P.2d 1153, 1168 (1999). Sanqui never directly testified that Bermisa was aware of the complications to the elderly of untreated bedsores. In fact, Sanqui testified she never worked with Bermisa at Hale Nani. Furthermore, there was expert testimony from Dr. Robinson and Dr. Kim on the complications to the elderly from untreated bedsores that overshadowed anything Sanqui said as a registered nurse.

Because there were no objections based on lack of foundation or hearsay to Sanqui's testimony, these points are waived. *Craft*, 78 Hawai'i at 294, 893 P.2d at 145.

### 2. Souza's Testimony.

Bermisa's point of error as to Souza's testimony is as follows:

Shirley Souza (Ms. Souza), a nurse with the Department of Health (DOH), Office of Health Care Assurance and State Licensing Section, testified in relevant part as follows. 10/19/00 TR: 182. She reviewed the records and files of the Bermisa Care Home. Mrs. Bermisa applied for and received a state license to operate a care home in August, 1995, met the qualifications of being a[CNA], completing eighteen months of work at Hale Nani Rehabilitation and Nursing Center, and had a[CNA] card. *Id.*: 184–185.

According to Ms. Souza, certified nurse's aides are taught patient care, skin care, and oral hygiene, feeding and activities of daily living at community college and the care facility where they are working. *Id.*: 186. In Mrs. Bermisa's application, it was presumed she learned the risks involved in improper maintenance of the skin. *Id.*: 186. Hale Nani wrote that Mrs. Bermisa had learned all types of care to be given to the residents, and that she was taught to report any changes. *Id.*: 186. Defense counsel did not object to her testimony.

Souza testified she had been a registered nurse and unit supervisor within the DOH, Office of Health Care Assurance and State Licensing Section since 1994. She reviewed applicants and applications for adult residential care homes. She had reviewed the records and files of Bermisa's care home and was familiar with Bermisa's qualifications in her application for a care home. Souza testified that Bermisa had a CNA card and had worked at Hale Nani. Souza testified that the duties of a nurse's aide included assisting patients in their personal care, bathing, and toilet care; taking vital signs; reporting any condition changes to their charge nurse; and reviewing and carrying out care plans.

Souza further testified as follows: Bermisa's care home application showed that Bermisa was a nurse's aide and had learned at Hale Nani the type of care to be given to residents, including reporting changes in condition of residents. Bermisa had obtained an Adult Residential Care Home module certification. Souza also described what was required for certification as a care home and what certification authorized a care home operator to do. Bermisa had been licensed to operate a care home from May 1999 through August 1999 and had been certified as a CNA at that time.

Souza's testimony was based on her observations and personal knowledge as a regis-

tered nurse and unit supervisor with the DOH, Office of Health Care Assurance and State Licensing Section, and her review of Bermisa's records and files, including Bermisa's application to operate a care home. It was not testimony in the form of opinion or inference, with the exception of Souza's testimony inferring that Bermisa knew about decubitus ulcers based on Bermisa's having obtained her CNA card, her Adult Residential Care Home certification, and her Hale Nani experience. This inference was proper lay opinion. It was rationally based on Souza's perceptions and observations within the Office of Health Care Assurance and State Licensing Section, including her review of Bermisa's records and files. It was helpful to the jury regarding Bermisa's qualifications to operate a care home.

Any hearsay or lack of foundation error was waived because Bermisa did not raise an objection at trial. *Craft*, 78 Hawai'i at 294, 893 P.2d at 145.

### 3. Tomas's testimony.

Bermisa's point of error as to Tomas's testimony is as follows:

> The State called Paul Tomas as it [sic] rebuttal witness. 10/25/00 TR: 215. During his testimony, defense counsel repeatedly objected to his testimony about what Mrs. Bermisa was taught regarding the prevention and risks of bedsores. *Id.:* 216–219. (The entirety of defense objections and the court's rulings are set forth in Appendix "B").

Tomas testified on rebuttal as follows. While he was working as a nurse consultant at the Department of Health, he learned of the requirements to run an adult residential care home. *Id.:* 216, 218. The DAG asked Tomas if he knew whether Mrs. Bermisa, as a[CNA], was trained in the prevention of bedsores and what she knew about the prevention of bedsores. *Id.:* 216–217. Over the objection of defense counsel on the grounds that such testimony was speculative, Tomas was permitted to testify that Mrs. Bermisa was trained in the prevention of bedsores because she had completed classes at Kapiol-

ani and worked in a long-term care facility. *Id.:* 217–218.

Tomas further testified that Mrs. Bermisa's care home was under his jurisdiction for two years and that she was aware of the requirements of Title 11, Chapter 100. *Id.:* 218. He testified that Mrs. Bermisa knew about the prevention of bedsores and the risks involved "[b]ecause of her experience and how she carried herself, how she would care for the resident, and in her—I guess her recordkeeping ..." *Id.:* 219. When asked by the DAG how he knew that Mrs. Bermisa knew the risks involved whenever a resident had a bedsore, Tomas responded, over the objection of counsel as to lack of foundation, "First of all, as a nurse, I know that a bedsore is a ... is a reflection of poor nursing care." *Id.:* 219–220. He was permitted to testify that [CNAs] are taught to prevent bedsores by repositioning the residents every two hours so that blood will flow to the area, by providing "[g]ood nutrition, activities, and if you suspect anything where there's redness, then the operator needs to recognize that and notify the physician." *Id.:* 220–221.

On cross-examination, Tomas testified that he did not attend classes with Mrs. Bermisa and had stated what he assumed was taught in her classes. *Id.:* 221–222.

Tomas testified as follows: He was a registered nurse who had been employed by the DOH as a nurse consultant monitoring adult residential care homes and special treatment facilities. His job was to inspect facilities covered by Chapter 100 of the administrative rules and to enforce the rules. While working at the DOH, he became familiar with the requirements a person would need to operate an adult residential care home, including being a CNA (which Bermisa was). His inspection of Bermisa's residential care home included reviewing Bermisa's records (including those of Tanouye), interviewing the residents and Bermisa, and physically inspecting the facility. Tomas testified as to what he saw and heard at his inspection of Bermisa's facility and stated that he reviewed the results of his inspection with Bermisa.

Tomas was called as a rebuttal witness by the State, and the following direct examination of Tomas by the deputy attorney general ensued:

Q. [DAG] And in Mrs. Bermisa's case, she was a[CNA]?

A. [TOMAS] That's correct.

Q. In that capacity, specifically do you know whether she was taught or trained in the prevention of bedsores?

[DEFENSE COUNSEL]: Your Honor, objection. Speculation.

THE COURT: To the form. Please restate.

BY [DAG]:

Q. Do you know as a—as a[CNA], Mrs. Bermisa—what can you tell the jury as to what Mrs. Bermisa knew when it came to the prevention of bedsores?

[DEFENSE COUNSEL]: Your Honor, speculation.

THE COURT: Form of the question. I'll permit it. Does he know? Do you know?

BY [DAG]:

Q. Do you know?

A. Can you repeat the question?

Q. Do you know if Mrs. Bermisa, because she is a [CNA], was taught in the area of preventing bedsores?

[DEFENSE COUNSEL]: Your Honor, objection.

THE COURT: The answer is yes, I know, or no, I don't know? Answer the question.

THE WITNESS: Yes.

BY [DAG]:

Q. What do you know? Can you explain to the jury?

A. First of all, she needed to be working as a nurse's aid[e] under the jurisdiction of an RN in the long-term care facility or an acute care hospital and also to completing the modules at Kapiolani.

Q. Okay. Are you familiar what the modules requires an operator undergo?

A. They teach them about how to take care of the resident, the disease process, prevention, what's available in the community, medication administration, and vari-ous other items that will prepare the operator to take care of the resident in their home.

Q. You were—you were a nurse consultant with the Department of Health; correct?

A. That's correct.

Q. And Mrs. Bermisa's care home was in your jurisdiction for how long?

A. Approximately two years.

Q. So you know her personally besides just knowing her records and files at the department?

A. Yes.

Q. Can you tell the jury—she was aware of the requirements of Title 11, Chapter 100?

A. Of Chapter 100?

Q. Yes.

A. That's correct.

Q. And how do you know?

A. Prior to licensing this home, she signs a form with the Department of Health stating that she will comply to all of the regulations in the administrative rules.

Q. Okay. Besides making that declaration, in your working with her as a consultant, did she show that she understood what she needed to do to operate a care home?

A. Correct.

Q. Okay. In operating a care home under Chapter 100, did Mrs. Bermisa know about the need to prevent—I mean, you know, she was taught about the prevention of bedsores and the risks involved?

[DEFENSE COUNSEL]: Your Honor, lack of foundation.

THE COURT: To the form. Sustained. Restate the question.

BY [DAG]:

Q. Do you know if she knew?

A. Yes.

Q. How do you know that?

A. Because of her experience and how she carried herself, how she would care for the resident, and in her—I guess her recordkeeping.

Q. How do you know—how can you tell this jury that Mrs. Bermisa knew the risks involved whenever a resident had a bedsore?

A. First of all, as a nurse, I know that a bedsore is a—

[DEFENSE COUNSEL]: Your Honor, objection.

THE COURT: I'll permit.

THE WITNESS:—is a reflection of poor nursing care.

BY [DAG]:

Q. Can you explain?

A. If you sat on your buttocks continuously, you would stop blood flow to that area and tissue would start to break down.

BY [DAG]:

Q. But for someone who is a [CNA] and worked in a facility, they are taught how to care for a resident; right?

A. Yes.

Q. And what things—and why are they taught these things?

A. To prevent bedsores? To reposition residents every two hours so that the blood flow will occur to that particular area.

Q. Besides repositioning residents, what else are they taught to prevent bedsores?

A. Good nutrition, activities, and if you suspect anything where there's redness, then the operator needs to recognize that and notify the physician.

During the cross-examination of Tomas by defense counsel, Tomas testified as follows:

BY [DEFENSE COUNSEL]:

Q. Mr. Tomas, you didn't attend class with Ms. Bermisa, did you?

A. No, I didn't.

Q. So you really don't know what she was taught in class? That's what you're assuming they were taught?

A. Actually we receive a piece of paper verifying that she has completed Module 12, 13 and 14—

Q. So you receive it—

A. —at Kapiolani.

Q. So you receive a piece of paper saying that she's been certified. She in effect has completed all the requirements to be certified?

A. Right.

Q. Okay. What I'm asking you is not that. I'm asking you whether you know what she was taught in class. You weren't there with her; is that correct?

A. That's correct.

Q. So you really don't know what she was taught in class. You're saying what you assume that she was taught in class?

A. Yes.

During her cross-examination, Bermisa admitted the following: She was required to learn the use of decubitus prevention aids. A substantial portion of her training at Hale Nani was specifically directed toward care and prevention of decubitus ulcers. She had to take a written test at Hale Nani that included four questions about decubitus ulcers. To obtain her certification as a nurse's aide, she had to have received training on decubitus ulcers.

Tomas's testimony regarding Bermisa's qualifications to operate an adult care home (including her certification as a CNA) and her operation of that home was based on his observations and personal knowledge as a nurse consultant monitoring adult residential care homes (including Bermisa's care home and records). It was not testimony in the form of opinion or inference, with the exception of his testimony on bedsores. This testimony required " 'scientific, technical or other specialized knowledge' such that expert testimony would have been required pursuant to HRE Rule 702." *Jenkins*, 93 Hawai'i at 105, 997 P.2d at 31. This error, however, was harmless. *Gano*, 92 Hawai'i at 176, 988 P.2d at 1168. Under cross-examination, defense counsel clarified that Tomas did not know what Bermisa had been taught in her CNA classes. Furthermore, Tomas's brief comment on bedsores was overshadowed by the expert testimonies of Dr. Kim and Dr. Robinson on bedsores.

Because defense counsel did not object to Tomas's testimony for lack of foundation and hearsay, any error was waived. *Craft*, 78 Hawai'i at 294, 893 P.2d at 145.

**D. There was sufficient evidence for a jury to find that Bermisa had a state of mind required to commit Manslaughter by omission.**

■ Bermisa contends the State did not present sufficient evidence to prove Bermisa possessed the requisite state of mind to commit Manslaughter by omission. The State contends it presented sufficient evidence to show Bermisa was aware and consciously disregarded the risk of infection from a decubitus ulcer that ultimately caused Tanouye's death.

Bermisa was convicted of recklessly causing the death of Tanouye. As noted in HRS § 702–206(3)(c) (1993), "[a] person acts recklessly with respect to a result of his [or her] conduct when he [or she] consciously disregards a substantial and unjustifiable risk that his [or her] conduct will cause such a result."

Hawaii Revised Statutes § 702–203 (1993) provides:

§ 702–203 **Penal liability based on an omission.** Penal liability may not be based on an omission unaccompanied by action unless:

(1) The omission is expressly made a sufficient basis for penal liability by the law defining the offense; or

(2) A duty to perform the omitted act is otherwise imposed by law.

Bermisa concedes she had a duty as a licensed care home operator to act pursuant to Hawaii Administrative Rules § 11–100–17, which provides:

§ 11–100–17 **Resident health care standards.**

(a) The operator shall provide health care within the operator's capabilities to the resident as prescribed by a physician.

(b) The operator shall be able to recognize, record, and report to the resident's physician significant changes in the resident's health status including, but not limited to, convulsions, fever, sudden weakness, persistent or recurring headaches, voice changes, coughing, shortness of breath, changes in behavior, swelling limbs, or abnormal bleeding.

(c) When in the opinion of the operator a resident has suffered a significant change in mental or physical well-being, a prompt report to the resident's physician shall be made. Any change in physician's orders shall be promptly carried out.

. . . .

(e) Residents shall be accompanied to emergency rooms and other medical care facilities with adequate records; a responsible person shall be available by phone.

The jury was instructed, in part, as follows:

Defendant is charged with the offense of Manslaughter based upon reckless conduct. A person commits the offense of Manslaughter based upon reckless conduct if she causes the death of another person by recklessly failing to perform a duty imposed by law, by failing to provide health care within her capabilities as prescribed by a physician, consciously disregarding a substantial and unjustifiable risk that her failure to provide health care would result in the death of another person.

There are four material elements of the offense of Manslaughter based upon reckless conduct. These four elements are:

1. That on or about July 16, 1999, to and including August 9, 1999, in the City and County of Honolulu, State of Hawaii, defendant was an adult residential care home operator; and

2. That defendant recklessly failed to perform a duty imposed by law upon an adult residential care home operator by failing to provide health care within her capabilities to Chiyeko Tanouye, a resident of defendant's care home, as prescribed by a physician; and

3. That defendant failed to perform that duty consciously disregarding a substantial and unjustifiable risk that the defendant's failure would cause the death of Chiyeko Tanouye; and

4. That the defendant's failure to perform that duty caused the death of Chiyeko Tanouye on August 10, 1999.

. . . .

A person acts recklessly with respect to a result of his conduct when he consciously

disregards a substantial and unjustifiable risk that his conduct will cause such a result.

A risk is substantial and unjustifiable if, considering the nature and purpose of the person's conduct and the circumstances known to him, the disregard of the risk involves a gross deviation from the standard of conduct that a law-abiding person would observe in the same situation.

The State presented credible evidence that Bermisa knew of the risk and result of infection from a decubitus ulcer. Bermisa had completed a three-month CNA course at KCC and had worked at Hale Nani for sixteen months as a CNA. She admitted she had training in prevention of and care for decubitus ulcers, and had been given specific instructions by Dr. Kim and Dr. Robinson as to the treatment for Tanouye. From her training, she was aware that an unclean, uncovered wound could lead to infection and that a person who had an infection could die. Bermisa knew Tanouye was supposed to have gone back to Dr. Robinson the next week. Bermisa knew the decubitus ulcers were increasing in size. She admitted that, under her Contract with Tanouye, she was obligated to take Tanouye to additional examinations at the recommendation of Tanouye's attending physician, and when Dr. Robinson told her to bring Tanouye back within one week of July 9, 1999, that was considered an additional examination. She admitted she did not take Tanouye back within one week.

On June 26, Dr. Kim told Bermisa that Tanouye had a decubitus ulcer, gave Bermisa specific instructions on how to treat the ulcer, and instructed Bermisa to bring Tanouye back in one week. When Bermisa took Tanouye for the follow-up visit with Dr. Kim on June 30, the decubitus ulcer had gotten bigger, and Dr. Kim referred Tanouye to Dr. Robinson.

Dr. Robinson provided Bermisa with information about decubitus. Dr. Robinson instructed Bermisa to "do dressing changes with gauze moistened with saline" two or three times a day, keep the ulcer clean, wash with Betadine, and apply Intrasite gel and Duoderm. Dr. Robinson instructed Bermisa to bring Tanouye back in one week.

Sanqui testified that CNAs at Hale Nani receive instruction and training about decubitus ulcers. Souza testified that a CNA is trained about the importance of skin care and maintenance.

The jury could reasonably have found from the evidence that Bermisa knew of the risks of infection from decubitus ulcers and failed to provide Tanouye with the care (as prescribed by Dr. Robinson) that was within Bermisa's capabilities, which care would have prevented the progression of the decubitus ulcers that caused Tanouye's death. Bermisa had a duty to take Tanouye to a follow-up appointment with Dr. Robinson, and Bermisa consciously disregarded a substantial and unjustifiable risk that her failure to perform this duty would cause Tanouye's death. There was sufficient evidence to support the jury's finding that the State proved beyond a reasonable doubt every element of the offense of Manslaughter by omission, including the requisite state of mind.

## IV.

The Judgment filed on January 10, 2001 in the Circuit Court of the First Circuit is affirmed.

Concurring Opinion by LIM, J.

I write separately only to express my belief that Luz Sanqui, Shirley Souza and Paul Tomas were fully qualified as experts to give the opinions that they did. Otherwise, I join in the reasoning and result of the majority opinion.